ANDREW, J.T.C.
In this matter plaintiff, Parkway Village Apartments Co., seeks a reduction in its local property tax assessments for tax years 1983 and 1984. Plaintiff-taxpayer contends that the assessment for the two tax years in question is in excess of fair market value and further asserts that the property is the subject of inequality in assessment and seeks application of an appropriate assessment ratio. At the outset of the trial the parties stipulated that the applicable chapter 123 ratio for 1983 *433 was 58.76% with an upper limit of 67.57% and a lower limit of 49.95% and that for 1984 the appropriate ratio was 57.11% with an upper limit of 65.68% and a lower limit of 48.54%. See N.J.S.A. 54:51A-6.
The property involved in this proceeding is known and designated as Block 332, Lot 1 on the tax map of Cranford and is commonly identified as Lambert Street, Cranford, New Jersey.
The property was assessed for each of the tax years in question as follows:
Land $ 517,500
Improvements 1,332,500
Total $ 1,850,000
Direct review of the assessments for both tax years has been sought in this court pursuant to N.J.S.A. 54:3-21.
Plaintiff through its appraiser, Carl Krell, contends that the fair market value of the subject property was $2,111,500 as of October 1, 1982 and $2,220,100 as of October 1, 1983 and that with the application of the appropriate ratio the proper assessments are $1,240,800 for 1983 and $1,267,900 for 1984.
Defendant through its expert appraiser, Joseph Baldoni, contends that the fair market value of the subject property as of the pivotal assessment dates was $3,137,000 for 1983 and $3,511,000 for 1984. It is further defendant’s position that plaintiff’s property was not subject to unequal assessment treatment and therefore the assessment for each tax year should be affirmed.
The parties are in substantial agreement regarding the description of the property. The subject is an irregularly-shaped parcel of land, 7.5 acres in size, located on the east side of Lambert Street in Cranford. The land is level and at street grade. The site is improved with nine two-story buildings, constructed in 1948, which contain 115 garden apartment units. There are, in addition, two garage buildings, also constructed in 1948, containing 45 garages. The garden apartments are of six types. There are 18 3V2-room apartments, 2 4-room apartments, 12 4V2-room apartments, 12 5-room simplex (meaning on *434 one floor) apartments, 68 5-room duplex (meaning on two floors) apartments and 3 6-room duplex apartments. There are sidewalks, open lawn areas and areas for on-site open parking. Also located on the site is laundry equipment available to the tenants on a concession basis. The property is serviced by all municipal and public utilities. The improvements are considered to be in good condition.
The experts are in agreement that the highest and best use of the subject property is the same as its present garden apartment use. The site is zoned R-7 (garden apartment residence zone) and the present use is in conformity with Cranford’s zoning requirements. There were no rent controls in Cranford during the applicable assessment periods.
As previously indicated plaintiff filed direct appeals with the Tax Court. In a proceeding in this court original assessments are presumed to be correct and the presumption is overcome only by the introduction of sufficient competent evidence to enable the court to determine the fair assessable value of the property. Aetna Life Ins. Co. v. Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952). Once the presumption of the correctness of the original assessment has been overcome in such a manner, this court should then appraise the evidence and determine the true value of the subject property and its appropriate assessment, provided, of course, that plaintiff carries its requisite burden of proof. Samuel Hird & Sons, Inc. v. Garfield 87 N.J.Super. 65, 75, 208 A.2d 153 (App.Div.1965); Rodwood Gardens, Inc. v. Summit, 188 N.J.Super. 34, 38-39, 455 A.2d 1136 (App.Div.1982). The standard of proof is that of the preponderance of the evidence. N.J.S.A. 2A:84A-5.
In this case each party relied upon the testimony of one appraisal expert to establish the value of the subject. The appraisal reports and the testimony of the experts were sufficiently detailed to enable the court to determine the true value of the subject property and, in turn, an appropriate assessment. Accordingly, I find that the parties have overcome the presumption of the correctness of the original assessment and I will *435 therefore make the necessary determination for each tax year. In doing so I am mindful of the principles recently enunciated by our Supreme Court in Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985) relative to the adoption of reasonable limits in what is to be expected of a litigant in presenting his case through the use of an expert in these days of rising litigation expenses. Id. at 280, 491 A.2d 1247.
Plaintiffs expert, Krell, predicated his estimates of value for 1983 and 1984 upon an income approach to value and checked his results by the use of a direct sales comparison of the subject property with two sales of allegedly comparable property. One sale involved a property in Springfield Township while the second was located in Cranford. He did not employ a cost approach.
Defendant’s expert, Baldoni, utilized all three valuation methodologies. His values by the cost approach were $3,250,000 for 1983 and $3,400,000 for 1984. His estimated values by the direct sales comparison or market data approach were $3,162,-500 for 1983 and $3,450,000 for 1984, and his indicated values by the income approach were $3,137,000 for 1983 and $3,511,000 for 1984. Baldoni’s correlated or reconciled final value estimates of $3,137,000 for 1983 and $3,511,000 for 1984 indicate that he gave the greatest weight to the income approach.
The resolution of a local property tax case requires, in many instances, a determination of which one or more of the three traditional valuation approaches may be the most reliable under the circumstances. In ITT Continental Baking Co. v. East Brunswick Tp., 1 N.J. Tax 244 (Tax Ct.1980) the cost approach was the primary approach adopted by the court because the proofs submitted in the cost approach were the most objectively reliable in that case. On the other hand, it is fundamental that evidence of sales of comparable properties can be helpful in the search for true value provided there is a substantial similarity between the properties so as to admit of reasonable comparison. Venino v. Carlstadt, 1 N.J.Tax 172, 175 (Tax Ct.1980), aff’d o.b. 4 N.J.Tax 528 (App.Div.1981). In Parkview Village *436 Assocs. v. Collingswood, 62 N.J. 21, 23, 297 A.2d 842 (1972), even though the experts utilized alternative valuation procedures, our Supreme Court concluded that the income approach was the most appropriate in the valuation of income producing properties and limited its discussion to the income approach.
The reproduction cost method of valuation produces a significant indication of value when the improvements are new and physical, functional and economic depreciation are objectively measurable. American Institute of Real Estate Appraisers, The Appraisal of Real Estate (8 ed. 1983) 444. The cost methodology may result in serious error when depreciation in all forms is not objectively measurable. Therefore, most courts have utilized this method as the only approach in those limited instances in which no other method of valuation would yield an economically realistic value. 1 Bonbright, Valuation of Property, 175-176. This pragmatic position is reflected in the modern appraisal practice of relegating the cost approach to a secondary role because cost may not accurately reflect market conditions. O’Flaherty, “Cost Approach to Value,” Friedman, Encyclopedia of Real Estate Appraising (3 ed. 1978) 66-67.
In this case, because of the inherent deficiencies of the cost approach particularly in regard to the measurement of depreciation and obsolescence which were entirely subjective, i.e., based solely on Baldoni’s observation and experience, I find that the cost approach is not a reliable indicator of value. Additionally, it should be noted that Baldoni neither offered market support for his estimated land value nor relied on the land assessment as adjusted by the chapter 123 ratio as permitted in Glen Wall Assocs., supra.
Both Krell and Baldoni employed a market data or direct sales comparison approach. Both clearly indicated that it was not the primary approach but was offered as a check on the other methods utilized by each. Krell was of the opinion that an investor would not make an investment decision “based upon one or two sales in a given geographic area.” He further indicated that “all adjustments to sale data are purely subjec *437 tive and reflect a perception of a single appraiser.” Krell also included ten factors in his report which explain why the market data approach must be used with a great deal of care if an objective estimate of value is to be derived. I agree with his cautionary notes. Nonetheless, he offered two sales of allegedly comparable property as a check or confirmation of his income approach value. I do not accept either. With regard to his first comparable, Troy Village in Springfield, it was demonstrated that he had no knowledge of the size of the rooms, the apartment mix, the land size, the zoning density of the apartments or the basic terms of Springfield’s rent control ordinance. His adjustments were entirely subjective judgments based solely on his observation and experience. Additionally, conspicuously absent from his calculations was an adjustment for size. Considering that the subject has 115 units while Troy Village has 346 units such an adjustment must be made absent some market evidence that such a differential has no affect on value.
Relative to his second comparable, a 45-unit three-story walkup in Cranford, I find an extended discussion unnecessary. It is not comparable and even if sufficient adjustments could be made to provide some indication of value, in this case each adjustment made by Krell was purely subjective lacking any market support. The weight to be given to an expert’s testimony relative to such adjustments depends upon the facts and reasoning which form the basis of the opinion. An expert’s conclusion can rise no higher than the market data providing the foundation. Passaic v. Gera Mills, 55 N.J.Super. 73, 150 A.2d 67 (App.Div.1959), certif. den. 30 N.J. 153, 152 A.2d 171 (1959). If data supporting adjustments are not presented this court cannot make an informed decision following the market data methodology.
The seven sales of allegedly comparable properties submitted by defendant’s expert, Baldoni, fare no better. Baldoni characterized the sale properties as having “certain similarities” to the subject even though they were "not ideally comparable.” Without going through each of the seven properties offered it is sufficient to note generally why little regard will be given by *438 this court to such sales. Initially, the same statements made previously with regard to the subjective nature of the adjustments apply with equal force here. Only one of Baldoni’s adjustments was supposedly supported by market data. The word “supposedly” is used because it was not clear that he relied upon a sale and resale to measure the rate of progression in making his time adjustment or whether it was an afterthought. In any event the data did not support his specific percentage adjustment. Other than that, each and every adjustment was a purely subjective decision on his part. This court clearly cannot test such subjectivity to determine appropriateness.
Additionally, Baldoni failed to follow his definition of market value as set forth in his appraisal report in that he failed to adjust any of the sales for favorable, below-market, financing involved in a number of the sales.[1] It is fundamental that basic appraisal principles require an appraiser to show the affect of atypical financing on market price and reflect it in his appraisal report. The Appraisal of Real Estate, supra at 33.
For the reasons expressed, I conclude that the use of the market data approach to measure the value of the property in this case is of little utility because of a lack of demonstrated comparability and a lack of sufficient supporting market evidence.
Even though Krell used the market data approach he clearly acknowledged that the income approach should predominate. In his testimony it was evident that he frowned upon the market data approach because of the lack of sufficient truly *439 comparable sale properties. In the same vein Baldoni gave his greatest emphasis to and relied most heavily upon the income approach.
I find that the most persuasive approach in the present matter is the income approach. See Helmsley v. Fort Lee Bor., 78 N.J. 200, 394 A.2d 65 (1978), app. dism. 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979) (“[T]he preferred valuation method for apartment buildings is the capitalization of income, since investors purchase apartment buildings as income producing properties.”). The cost of construction, i.e., the cost of the bricks and mortar, is of little or no importance to a prospective purchaser as his chief concern is with the income that he can expect to receive. By the same token a purchaser is not concerned with the price for which other properties may be sold. Parsippany Hills Assocs. v. Parsippany-Troy Hills, 1 N.J.Tax 120, 122-123 (Tax Ct.1980).
The logical justification for the income approach to value is the
... common knowledge that a prospective investor in realty expects a fair return upon any investment he makes, and, before investing, studies the income history of the property and considers its income-producing potentiality. [Annotation, “Income or rental value as a factor in evaluation of real property for purposes of taxation,” 96 A.L.R.2d. 666, 669 (1964) ]
Therefore I will determine the appropriate assessment in this case for each tax year based on an economic analysis. Each expert estimated the value of the subject by this procedure but differed in a number of their conclusions.
Initially the experts differed somewhat in their estimates of economic income. In arriving at his determination of economic rent Krell utilized the actual rent rolls for October 1, 1982 and October 1, 1983. He annualized each of these rent rolls by multiplying by 12. It was his opinion that the actual rents constituted economic or fair market rent for the tax years in question. Krell relied upon the following language in Parkview Village Assocs. v. Collingswood, supra, for his procedure.
In the absence of convincing evidence to the contrary the current ongoing income scale of a large, well-managed apartment project like this, functioning as customary with leases of relatively short length, should be deemed prima facie to represent its fair rental value for purposes of the capitalized income *440 method of property valuation. A court or taxing agency should be most hesitant to find that the tenants of a residential property being operated commercially are being charged inadequate rent. [62 N.J. at 34, 297 A.2d 842]
Baldoni, on the other hand, did not follow this procedure. Rather, he selected the highest rgnt achieved in each of the six different categories of apartments in the complex as of each assessing date and annualized that figure. He did this because there were no discernable differences between apartments within the same category, hence the highest rent achieved as of the assessment date would represent economic rent for all apartments within the same category. Baldoni indicated that he followed this practice even if there was only one apartment in a category achieving such a rental.
The evidence demonstrated that the differences in rentals within apartment categories could be due to one or two reasons. First, the landlord favored his long-time tenants with less than market rents, or second, the disparities within apartment categories were due solely to the timing of lease terminations, e.g., some leases ending in November, others in January. I need not specifically conclude whether it is one or both of the reasons advanced for I am of the opinion that it makes no difference. The rental which is capable of being achieved on the assessment date is the correct rental to be assigned in an economic analysis. This is so, whether the rental is actually being obtained or not.
The definition of economic or market rent is that “rental income that a property would most probably command in the open market as indicated by current rents being paid and asked for comparable space as of the date of the appraisal.” The Appraisal of Real Estate, supra at 352. “Contract rent is the actual rental income accruing to a property under the terms of the lease.” Ibid.
Economic rent is the starting point. If contract rent equals economic rent it can be used as a starting point. If they differ, however, it is economic rent, i.e., that rent which an apartment would most probably command on the assessment date, that must be used. Here that accords with Baldoni’s analysis. As I *441 previously noted all apartments within a class are without discernable differences. Krell admitted that all apartments within a particular category were identical. Absent differences, logically, each apartment within a category should command the same rental if the lease is negotiated on the same date.
Parkview Village Assocs. does not dictate a contrary conclusion. It simply provides an economical means of proving economic rent through contract rent provided there is no convincing showing that contract rent may not be the equivalent of economic rent. Parkview itself distinguishes the “long term lease made long before the current assessing date, where the [contract] rent may be out of line with current fair rental value.” Id. at 35, 297 A.2d 842. The reason that Parkview distinguished the old long term lease was that such a lease, in a period of increasing rentals, created a leasehold interest that had an economic advantage (contract rent less than market or economic rent) that had a value. For example, assume that a one-year lease executed November 1, 1981 provides for a rental of $350 a month while a one-year lease for an identical apartment next door which is executed on October 1, 1982 provides for a rental of $390. Absent a difference in the apartments can one say that the rental of $350 a month represents economic rent on October 1, 1982?[2] The only difference between this situation and a long term lease reflecting lower than market rent as in Parkview is the length of time. In each case whether it is a five-year lease or a one-year lease the tenant has a leasehold interest which must be valued pursuant to N.J.S.A. 54:4-23 for local tax purposes. Therefore, I will accept Baldoni’s method of calculating economic rent. Cf. Rudd v. Cranford Tp., 4 N.J. Tax 236, 243 (Tax Ct.1982).
*442 There was no dispute by the experts as to the income attributable to the operation of the garages. Therefore, I will accept the sums advanced by both as constituting economic income. There was also no dispute relative to actual interest income attributable to the security deposits, and therefore, I will accept the amounts set forth in Krell’s appraisal report for this item.
With regard to the income attributable to the laundry concession, the experts differed widely in their estimates. Krell used the actual income reported by the owner for each tax year while Baldoni did not use the actual income because he felt that a greater amount of income could be generated by the owner. Relying solely on his experience, Baldoni expressed the view that $3 per week per unit would be a fair and appropriate estimate of the income that could be generated. In the absence of some supporting data Baldoni’s estimate is nothing more than pure conjecture. The actual income is more persuasive than an unsupported estimate. Therefore I will adopt Krell’s income figures for laundry income.
Both experts agreed that a 2% vacancy and collection loss allowance would be appropriate in this case. I will therefore adopt this estimate because it is uncontroverted by the experts and it appears to be fair and reasonable under the circumstances.
With regard to the expenses both experts accepted the actual expenses incurred by the owner relative to insurance, fuel, gas and electric, water and sewer, and payroll to include employees’ welfare and payroll tax. Since there is no dispute as to these items and as they appear to be within normal operating limits I will adopt the actual expenses advanced by both experts. Additionally, Krell used the actual miscellaneous expense shown in the owner’s operating statements for each pretax year. Baldoni stabilized the actual miscellaneous expenses by simply rounding off the actual expense figures. The differences are insignificant. I will, therefore, accept Krell’s use of the actual miscellaneous expense incurred by the owner.
*443 There were three areas within the expenses in which the two appraisers differed in their allowances. These were (1) repairs, maintenance, painting and supplies to include landscaping and snow removal, (2) management, legal and auditing and (3) reserve for replacements.
With regard to the expense category of repairs, maintenance, painting and supplies, Krell used the actual expenses incurred by the owner for these items as reported in the owner’s operating statements for the years ending December 31, 1982 and December 31, 1983. Krell decided to use the actual expenses because the subject was constructed under an “FHA Section 608” program which thereby indicated to him that the construction was poor, essentially because good materials were unavailable at the time of the subject’s construction. He indicated that high repair expense allowances were in order because of the subject’s steel casement windows (requiring repair parts not readily available), galvanized pipe (used instead of copper), constant roof leaks because of false chimneys (constructed to give the buildings a colonial appearance) and a 34-year old boiler needing many repairs. It was shown that painting expense had increased from $13,937 in 1982 to $43,538 in 1983. Questioned as to whether this was an atypical expense in 1983 Krell explained that the owner of a § 608 apartment complex can expect that there will be a requirement for a major repair each and every year, i.e., one year a boiler, the next year water heaters, then windows, etc.
Baldoni, on the other hand, stabilized this category of expense at approximately 6% of gross income. He did so because he believed that the actual expense numbers for 1982 and 1983 were exceptionally high and did not fall within reasonable expense limits. This was corroborated by his review of the owner’s income and expense statements for 1979,1980 and 1981 in addition to 1982 and 1983. (The record indicated that Krell did not review nor consider the income and expense statements for the years of 1979, 1980 and 1981). The expense figures for the earlier years were much less thereby indicating to Baldoni that the actual expenses for 1982 and 1983 in the repair *444 category were extraordinary expenses that were not typical of an ordinary year of operation.
I find that I am in agreement with Baldoni’s estimate of expense for this category. It is clear that an appraiser’s function is to reconstruct a yearly pattern of expenses. Murnick v. Asbury Park, 2 N.J.Tax 168, 181-182 (Tax Ct.1981) rev’d on other grounds 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982), rev’d in part, aff’d in part 95 N.J. 452, 471 A.2d 1196 (1984); see The Appraisal of Real Estate, supra at 362, 367, 370-371.
Expenses vary from year to year, and it is important to review operating statements for three or more years in order to determine whether certain expenses are typical or atypical. See American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7 ed. 1978) 357.[3] Krell did not review the owner’s statements for 1979 to 1981 while Baldoni did. Baldoni’s estimate better reflects the patterned expense to be anticipated by the potential purchaser. I am not persuaded by Krell’s assertion that there will be a major expense in the repair category eách and every year since the historical operating statements do not bear this out. I must therefore adopt Baldoni’s repairs category expense of $37,184 and include the allowance for landscaping and snow removal of $5,430 in the same category (as apparently had Krell) for a total of $42,614 for 1983 ($37,184 + $5,430 = $42,614) and $45,966 for 1984 ($40,536 + $5,430 = $45,966).[4]
*445 The next point of disagreement in the opinions of the experts was with regard to the allowance to be made for management, legal and auditing expenses. Krell used a stabilized allowance of 5% of effective gross income for this category because he felt that 5% was typical of what a management firm would charge for this service.
Baldoni, however, felt that since the subject was being competently managed by the Punia Company for less than 5% that the actual management fee incurred should be utilized. But, he felt that the actual professional fees incurred were exceptional and he, therefore, stabilized this actual expense downward for each year.
Neither expert offered objective market data showing comparable expenses for similar properties to substantiate their conclusions. As indicated by The Appraisal of Real Estate, supra, a management expense “is usually expressed as a percentage of effective gross income and reflects the local pattern for such charges.” Id. at 365. Absent some evidence as to the local pattern for such charges I will accept the actual expense incurred by the owner for professional fees and management fees (to include telephone). I will not allow the expenses listed in plaintiffs operating statements as “office expenses” and “dues and subscriptions” since there was no explanation of the nature of and need for these expenses relative to the operation of the real estate. Id. at 370. Therefore I will accept the sum of $26,757 for 1983 (professional fees — $9,758, telephone— $1,073, management fee — $15,926) and $26,220 for 1984 (professional fees — $7,289, telephone — $1,313, management — $17,618).
The next area of disagreement between the experts was with regard to an allowance for the category of reserve for replacements. Krell estimated this expense to be 2% of gross rent potential and indicated that it was intended to provide for *446 refrigerators, stoves, roof covering, parking areas and the boilers. He placed emphasis on one boiler which had been in operation for 34 years and noted that a companion boiler had been replaced seven years ago.
Baldoni allowed $9,010 specifically for this category which was based on the need for replacement of refrigerators, ranges and dishwashers. His computations with regard to these items appear to be fair and reasonable as far as they go, but they did not cover all the building components that wear out faster than the building itself. As specified by Krell these include roof covering, parking areas and boilers. Id. at 368-369. Since Krell’s estimate provides for the periodic replacement of these items while Baldoni’s appraisal does not, I will accept Krell’s estimate as more persuasive with regard to this category of expense.
Before moving to a major area of divergence involving the selection of an appropriate capitalization rate, it should be stated that Baldoni recognized that an allowance must be made for the apartments of the superintendent and the assistant superintendent, this being appropriate because the owner was charged with the income to be achieved from these two units yet was not receiving the rent in full because the apartments constituted additional compensation to the stated employees. Baldoni calculated this expense to be $9,120 for 1983 and $10,560 for 1984. While there was some confusion with regard to the appropriate allowance for the apartment of the assistant superintendent in that it may have been lower than Baldoni’s estimate I have no difficulty in utilizing Baldoni’s calculation. Defendant cannot complain because it was his expert’s calculation and plaintiff cannot complain because if there is an error it redounds to plaintiff’s benefit.
Additionally, Baldoni admitted that he overlooked the exterminating expense in his repairs and maintenance category. Since I have adopted his estimate for this class of expense I will include as additional expense the actual expense incurred by the *447 owner for exterminating pursuant to the owner’s operating statements. This amounts to $798 for 1983 and $770 for 1984.
That brings us to the dispute with regard to the proper capitalization rate to be employed in this case. Krell selected an overall capitalization rate before real estate taxes of 13% for both 1983 and 1984 while Baldoni was of the opinion that an appropriate overall capitalization rate before real estate taxes would be 10% for 1983 and 9.75% for 1984. Both agreed that the appropriate effective tax factor to be added to the overall rate would be 2.66% for 1983 and 2.76% for 1984.
Krell derived his capitalization rate from a combination of land and building assessment ratios and land and building capitalization rates as follows:
Capitalization Weighted
Component Ratio Rate Rate
Land 25% X 11.5% 2.875%
Building 75% x 13.5% 10.125%
Overall rate before real estate taxes 13.00 %
With the addition of the effective tax factor the total overall rate including real estate taxes was 15.66% for 1983 (13% + 2.66% = 15.66%) and 15.76% for 1984 (13% + 2.76% = 15.76%). Krell also developed an overall capitalization rate of 13.04% for 1983 and 1984 using a modified band of investment technique as additional support for his chosen rates of 13% for 1983 and 1984. This additional rate was derived as follows:
Loan Capitalization Weighted
Component Ratio Rate Rate
Mortgage 75% X 14.06% 10.54%
Equity 25% X 10 % 2.50%
Overall rate before real estate 13.04%
Addition of the effective tax factor for each year produced the total capitalization rate of 15.70% for 1983 (13.04% + 2.66% = 15.70%) and 15.80% for 1984 (13.04% + 2.76% = 15.80%).
*448 Krell indicated that in his land-building capitalization rate he did not obtain his basic interest rate from any one source, rather, it was a synthesis of interest rates available from alternative investments reflected in various appraisal publications included in his appraisal report. He felt that his chosen land-building rates were reasonable in light of his educational background, his investment experience and his experience in managing real estate. He concluded that these would be the rates necessary to attract investors to the subject property. He further indicated that his mortgage-equity band of investment methodology supported his selected rates. In support of the rates selected in this technique he referred to statistical tables published by the American Council of Life Insurance (ACLI). Here, again, however, the numbers reported by the ACLI did not specifically corroborate the rates nor the loan-to-value ratio selected by Krell albeit the selections were either reasonably close to or within the limits of the tables. There were no specific market data advanced by Krell to support either of the components in his land-building capitalization rate formulation other than a wide range of alternative investments. While there is support in the ACLI tables for the interest rate used in the mortgage portion of his mortgage-equity band of investment technique there is absolutely nothing in the record to support the component of the equity dividend rate other than a wide range of alternative investments. It was because of this that defendant argued in its brief that plaintiff had failed to overcome the presumption of correctness citing Glen Wall Assocs. v. Wall Tp., 6 N.J.Tax 24 (1983), aff’d o.b. 6 N.J.Tax 448 (App.Div.1984). However, our Supreme Court has reviewed the Tax Court Glen Wall decision and has held that this court has the knowledge and expertise to determine a proper capitalization rate from rates of return available on alternative investments and that those investments need not be real estate investments. Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985). Therefore, it is clear that Krell’s testimony and appraisal report does surmount the presumption of correctness.
*449 However, defendant contends further that its expert produced more appropriate capitalization rates because they were derived from market transactions in real estate comparable to the subject. Baldoni used four sales of allegedly similar competitive investment properties to derive his chosen capitalization rates. It was Baldoni’s position that while the sales properties did not bear exact similarity in many respects to the subject they were indicative of what returns potential purchasers do seek and obtain in real estate transactions. The Appraisal of Real Estate, supra, provides that an overall capitalization rate derived from sales of similar investment properties is the preferred technique. Id. at 388, 390. However, this preference is contingent upon the availability of sufficient data from transactions of similar, competitive properties. A noted appraisal commentator has indicated that in deriving a market capitalization rate there must be a high degree of uniformity among the properties considered. Akerson, Capitalization Theory and Techniques (4 ed. 1984) at 17; see also Maple Court Assocs., Ltd. v. Ridgefield Park Tp., 7 N.J.Tax 135, 156 (Tax Ct.1984).
The similarity between the competitive investment properties and the subject required in the use of this market capitalization technique was not demonstrated by Baldoni. Additionally, there was a conspicuous absence of the data concerning income, expenses and financing terms at the time of sale for each sale transaction. The Appraisal of Real Estate, supra at 388. The Appraisal of Real Estate cautions that:
Appraisers must be confident that the net operating income from each comparable is calculated and estimated in the same way as that for the subject property and that neither nonmarket financing terms nor different market conditions have affected the transaction prices of the comparables. [Ibid]
To begin with, Baldoni made no adjustments in the comparable sales transactions data for the atypical financing involved in each sale. The range of capitalization rates which he derived from the unadjusted sales data was 9.03% to 10.53%. However, by way of rebuttal, Krell made an uncontroverted cash equivalency analysis to account for the atypical financing involved in the sales, and in each instance the indicated capitalization rate *450 increased. Krell also noted a few discrepancies in Baldoni’s data relative to the net income reported in two of the sales. With these changes Baldoni’s sales data produced a range of rates from 9.83% to 11.68%. Krell, however, did not feel that these rates, even with the changes, reflected valid capitalization rates. Because of the paucity of the data relative to the sales transactions I am constrained to agree. Baldoni’s data pose more questions than they answer.
In order to derive market capitalization rates from sales transactions it is necessary to know whether the rents derived by the comparable property were economic at the time of sale or could be brought to an economic level shortly after the sale. (An examination of the leases would be required). It is also necessary to know if the expense statements of the comparables included allowances for vacancies, management and/or a reserve for replacements since these may not appear on the typical accounting statement. Baldoni did not have the statements available for review, therefore, the record does not provide an answer.
It is also necessary to know whether the expenses incurred in the year of the sale reflected a typical expense pattern or atypical expense items. It is conceivable that the operating statements will reveal deferred maintenance (that is, minimal repair and maintenance expenses because the owner sought to maximize income because he intended to sell). The nonavailability of the statements precludes any review. These are only representative of a number of unanswered questions relative to Baldoni’s data, all of which could substantially affect the market derived capitalization rates.
In order to obtain relevant capitalization rates from the market an appraiser is literally obliged to reconstruct an entire operating statement for each comparable sale transaction to insure that the capitalization rate derived can be used legitimately in a reconstructed statement for the subject property. The derivation of a capitalization rate from market transactions is certainly an attractive method of rate estimation, The Ap *451 praisal of Real Estate, supra at 388, but it loses its charm if the required data are not available. See Glen Wall Assocs., supra at 280, 491 A.2d 1247.
Unfortunately, I must conclude that I can give little weight to Baldoni’s capitalization rate analysis.[5] However, this conclusion does not require that I accept Krell’s exact capitalization rate. As previously noted our Supreme Court has held that this court has the knowledge and expertise to examine alternative investment rate data and determine an appropriate capitalization rate. Glen Wall Assocs., supra at 280-281, 491 A.2d 1247. My review of the record reveals that average capitalization rates reflected in the ACLI tables for the fourth quarters of 1982 and 1983 were 11.4% and 10.7% respectively. Rates on alternative investments in The Appraiser, December 1983 show a range in bond yields from 9.15% to 14.73% for October 1982 and a range from 8.92% to 13.43% for October 1983. Based on these indices and also fully considering KrelPs testimony and appraisal report, I conclude that an appropriate capitalization rate exclusive of real estate taxes would be 12% for both tax years of 1983 and 1984.[6] Addition of the appropriate effective tax factor produces a total capitalization rate of 14.66% for 1983 (12% + 2.66% effective tax rate) and 14.76% for 1984 (12% + 2.76% effective tax rate). I have concluded that the overall rate of 12% should be applied for both tax years because the assessment process cannot be so sensitive to rates of return available in money markets that it requires an assessor to adjust his assessment roles to yearly fluctuations. New Brunswick v. Tax Appeals Div., 39 N.J. 537, 550, 189 A.2d 702 (1963). “A rate of return should reflect conditions for a reason *452 able span of years.” Ibid. My selection of 12% is based on alternative financial investments but is tempered with the advantages that accrue to an investor in real estate as opposed to other financial investments. In this vein I have considered the fact that an investment in real estate offers a hedge against a decline in the purchasing power of money and additionally provides an opportunity for gain in a rising real estate market. I am also mindful of the federal income tax benefits available to an owner in the nature of depreciation deductions and capital gains treatment when the property is sold.
In accordance with the foregoing I have determined by means of an economic analysis that the value of the subject property is as follows:
1983
Gross potential rental income $596,700
Income for garages 8,700
Income form laundry concession 4,260
Interest income on security deposits 792
Total f 610,452
Less Vacancy and Collection Loss at 2% 12,209
Effective Gross Income ? 598,243
Less Expenses
1. Insurance $ 8,691
2. Fuel 66,910
3. Gas & electric 8,844
4. Water & sewer 8,976
5. Payroll (including employees’ welfare and payroll tax) 34,964
6. Miscellaneous 2,372
7. Superintendent and Ass’t superintendent apartments 9,120
8. Exterminating 798
9. Repairs, maintenance, painting & supplies (to include landscaping and snow removal) 42,614
10. Management and professional fees 26,757
11. Reserve for replacements at 2% of gross rent potential 11,934
Total Expenses 221,980
Net Operating Income $ 376,263
$376,263 capitalized at 14.66% (12% overall rate + 2.66% tax) Value for 1983 (rounded) $2,566,600

*453

The value as determined for 1983 produces a ratio of assessment to true value of 72.08% ($1,850,000 -f- 2,566,600 = 72.08%). It is clear that an application of the chapter 123 average ratio for 1983 of 58.76% is appropriate in this case since the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit (67.57%) of the common level range. Therefore, the assessable value for 1983 will be $1,508,200 rounded. The allocation between land and improvements will be in accordance with the existing assessment ratio.
The value as determined for 1984 produces a ratio of assessment to true value of 64.87% ($1,850,000 -=- 2,851,800 = 64.87%), *454 which is within the common level range of chapter 123 (upper limit 65.68% — lower limit 48.54%). Therefore the original assessment for 1984 must be affirmed.
The Clerk of the Tax Court is directed to enter judgment as follows:
1983 1984
Land $ 422,300 Land $ 517,500
Improvements 1,085,900 Improvements 1,332,500
Total $1,508,200 Total $1,850,000

 Baldoni’s report provided that implicit in his proffered definition of market value is the condition that "financing, if any, is on terms generally available in the community at the specified date and typical for the property type in its locale” and the further condition that "the price represents a normal consideration for the property sold unaffected by special financing amounts and/or terms, services, fees, costs, or credits incurred in the transactions." This accords with the implicit conditions set forth in The Appraisal of Real Estate, supra at 33.

 Five rental agreements were executed on October 1, 1982 for apartments in the 5-room duplex category. Each was for $450 a month. There were at the same time 45 lease agreements at $410 a month and 16 leases at $420 a month. Baldoni selected $450 as the economic rent for all of the units within the same category.

 This is the only reference to the seventh edition of The Appraisal of Real Estate. All other references to The Appraisal of Real Estate in this opinion relate to the eighth edition.

 Plaintiff argues in its brief that its own expert, Krell, overlooked an admittedly legitimate repair and maintenance expense, viz., the auto expense for each of the tax years as reflected by the operating statements. Plaintiff asserts that the expense was caused by the use of a truck for landscaping and snow removal. However, there is nothing in the record' to support counsel’s assertion. Without some foundation in the proofs I cannot adopt such a factual conclusion.
*445 It should also be noted that the allowances permitted by this court are not exactly 6% of gross income but do represent a fair allowance for the stated items based on Baldoni’s testimony.

 The degree of precaution required in the selection of capitalization rates from the market is reflected in Cohen, “Extracting Cap Rates ‘From the Market’: Beware!," The Appraisal Journal (July 1979) at 370.

 It is noted that the selected rate does exceed the average capitalization rates published by the ACLI for the stated periods. As Krell indicated the properties involved in the ACLI statistics are of very high quality which permits a lower capitalization rate.