NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

# TAX COURT OF NEW JERSEY



**MARY SIOBHAN BRENNAN**
JUDGE

Essex County Dr. Martin Luther King, Jr. Justice
Building 495 Martin Luther King Blvd. - Fourth Floor
Newark, New Jersey 07102-0690
(609) 815-2922 Ext. 54600
Fax: (973) 424-2424

May 19, 2022

Michael Schneck, Esq.
Schneck Law Group
301 South Livingston Avenue, Suite 105
Livingston, New Jersey 07039

Kenneth A. Porro, Esq.
Chasan Lamparello Mallon & Cappuzzo
300 Lighting Way, Suite 200
Secaucus, New Jersey 07094

> Re: **Eilat Realty Company v. City of Bayonne**
> Docket Nos.: 005282-2017, 000149-2018, 000252-2019 & 006560-2020, 000984-2021
> Block 295, Lot 18
>
> **Eilat Realty Company v. City of Bayonne**
> Docket Nos.: 005274-2017, 000150-2018, 000253-2019 & 006561-2020, 000985-2021
> Block 295, Lot 20

Dear Mr. Schneck and Mr. Porro:

This letter constitutes the court's opinion following trial of the local property tax appeals filed by Eilat Realty Company ("Eilat" and "plaintiff") for the 2017, 2018, 2019, 2020 and 2021 tax years, and the 2020 counterclaims filed by the city of Bayonne ("Bayonne" and "defendant").

For the reasons stated more fully below, the court finds that the subject properties are not so functionally integrated as to form a single economic unit, and affirms the assessments for tax years 2017, 2018, 2019, 2020, and 2021.






Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.

## I.     Findings of Fact

Eilat is the owner of two adjoining residential apartment facilities, located at 7-11 North Lane and 107-111 North Street in Bayonne ("subject properties"). The subject properties are identified on Bayonne's municipal tax map as Block 295, Lots 18 and 20. Built in 1976 as a condominium complex, the subject properties are three-story[1] buildings in average condition. The foundations are poured concrete, and the buildings contain a steel frame and brick exterior walls. The HVAC system is hot water base board. There is no central air conditioning, only built-in wall units.

There are 34 residential apartment units on Lot 18, and 31 residential apartment units on Lot 20. The individual units consist of either two-bedroom, one-bedroom, or studio apartments. Both buildings have an asphalt parking lot with one parking space assigned to each unit. A fence and hill separate the subject properties. The buildings also possess separate entrances and separate

---

[1] Eilat's answers to interrogatories and expert's appraisal report contend that these are two-and-a-half story buildings; however, the exterior photographs are consistent with three-story buildings, and both experts testified at trial that the subject properties are three-story buildings.

mortgages.[2] The parties disagree as to whether the subject properties should be appraised as one economic unit.

Bayonne is situated in Hudson County, which is in the heart of the New York metropolitan area, in northeastern New Jersey. It is bordered by the Hudson River and Upper New York Bay to the east; Kill van Kull to the south; Newark Bay and the Hackensack River or the Passaic River to the west; and its only land border is shared with Bergen County to the north and west.

The confluence of roads and railways passing through Hudson County makes it one of the Northeast's major transportation crossroads and provides access to an extensive network of interstate highways, state freeways and toll roads, and vehicular water crossings. There are many local, intrastate, and Manhattan-bound bus routes, expanding light rail systems, ferries traversing the Hudson River, and commuter trains to North Jersey, the Jersey Shore and Trenton. Much of the rail, surface transit, and ferry system is oriented to commuters traveling to Newark, lower and midtown Manhattan, and the Hudson Waterfront. Hudson is the only county in New Jersey where more residents (127,708) used public transportation than those who drove (124,772).

There are many amenities in Bayonne and in the vicinity of the subject properties that contribute to their market value. For instance, the subject properties are within walking distance

---

[2] Title has remained in possession of the current owner or related parties for decades following the revocation of a Master Deed from Aviv Company (condominium ownership). In October 2020, Regal Bank funded two separate $3-million-dollar mortgages on each property.

to a waterfront area. Although near the waterfront, the subject properties are not in a flood zone.

The subject properties are in Bayonne's R-3 "Medium Density Residential District" and both buildings situated on the 1.345-acre site are of a legally conforming use.[3] Income is derived from apartment rentals, a minority of which are subject to rent control. Bayonne's Rent Control Ordinance limits annual rent increases based on changes in the Consumer Price Index (5.5% cap). Pursuant to Bayonne's Vacancy Decontrol provision, once a rent-controlled apartment is vacated, rent control no longer applies and the landlord may charge market rent.

In addition to base rent, each tenant pays for heat, electricity, and hot water. The landlord pays for cold water, sewer, common area electric, maintenance, etc. Each building also contains a laundry room with coin-operated washers and dryers.

Lot 18 is a 37,314 square foot, irregularly shaped lot. The building adheres to the current zoning requirements of 1000 sf. It has 233.04 feet of frontage on North Street. Lot 20 is a 28,700 square foot, irregularly shaped lot. The building also adheres to the current zoning requirements of 1000 sf. It has 301.08 feet of frontage on North Lane.

The income information obtained through discovery consisted of separate rent rolls for each parcel, with effective dates of September 30, 2014, October 1, 2015, September 28, 2016, October 5, 2017, October 2, 2018. The average rent per month for Lot 18 was $974 in 2016, $986

---

[3] Since the parking lots fail to comply with Bayonne's yard and bulk requirements, they qualify as a pre-existing legal, non-conforming use.

4

in 2017, $988 in 2018, $1,004 in 2019, and $1,057 in 2020. The average rent per month for Lot 20 was $986 in 2016, $998 in 2017, $1,006 in 2018, $1,038 in 2019, and $1,082 in 2020. Neither party provided information regarding the laundry room income. Plaintiff did provide Internal Revenue Form 8825[4] ("Form 8825") for both parcels combined, for tax years ending December 31, 2014, 2015, 2016, 2017, 2018, 2019 and 2020. The gross rent for those years included $672,346 in 2014, $718,372 in 2015, $724,107 in 2016, $737,022 in 2017, $732,532 in 2018, $809,730[5] in 2019, and $784,188[6] in 2020.

Expenses were also provided in discovery via Form 8825. The expense information contains several verifiable discrepancies and multiple concerning inconsistencies.

Section 1 states "Show the type and address of each property…" and provides four sections (A, B, C and D) to enter the requested information and data. Then it requests the "Physical address of each property – street, city, state, ZIP code." Eilat only entered information in one section (A). The information entered is:

Apartment House
218 So. Livingston Ave.
Livingston, NJ 07039

---

[4] Form 8825 is entitled Rental Real Estate Income and Expenses of a Partnership or an S Corporation.

[5] This figure was taken from a chart prepared by Bayonne's expert and admitted into evidence (D16) without objection.

[6] This figure was taken from a chart prepared by Bayonne's expert and admitted into evidence (D16) without objection.

Additionally, the tax expense line item is substantially different from the real property taxes due (assessment multiplied by tax rate) as demonstrated in the following chart:

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|
| Tax Rate | 7.4450% | 7.6740% | 7.9350% | 8.2390% | 8.4580% | 8.6300% | 2.5660% | 2.6120% |
| Lot 18 | 1,167,400.00 | 1,167,400.00 | 1,167,400.00 | 1,167,400.00 | 1,167,400.00 | 1,167,400.00 | 3,566,000.00 | 3,566,000.00 |
| Lot 20 | 1,075,800.00 | 1,075,800.00 | 1,075,800.00 | 1,075,800.00 | 1,075,800.00 | 1,075,800.00 | 2,697,100.00 | 2,697,100.00 |
| Total Taxes Assessed | 167,006.24 | 172,143.17 | 177,997.92 | 184,817.25 | 189,729.86 | 193,588.16 | 160,711.15 | 163,592.17 |
| Taxes Expensed on Return | 165,966.00 | 224,786.00 | 181,845.00 | 243,408.00 | 238,293.00 | 178,286.00[7] | 234,669.00[8] | No value admitted in evidence |
| Difference[9] | -1,040.24 | 52,642.83 | 3,847.08 | 58,590.75 | 48,563.14 | -15,302.16 | 73,957.85 | N/A |

A review of the other expenses listed on Form 8825 for years 2014 through 2020 shows multiple inconsistencies. Insurance ranged from a low of $39,158 in 2016 to a high of $96,542 in

---

[7] This figure was taken from a chart prepared by Bayonne's expert and admitted into evidence (D16) without objection.

[8] This figure was taken from a chart prepared by Bayonne's expert and admitted into evidence (D16) without objection.

[9] The overall difference, for tax years 2014 through 2020, of taxes listed on the Form 8825 and the real property taxes due equates to $221,259.25. Therefore, plaintiff claimed more taxes than were owed in real property taxes.

2020. Common area utilities ranged from a low of $70,236 in 2018 to a high of $124,232 in 2020. Total operating expenses ranged from $ 711,276 in 2014 to $967,738[10] in 2020.

Procedurally, for all years at issue, Eilat filed timely direct appeals with the Tax Court. Bayonne filed an Answer and Counterclaims as to tax year 2020 only. The court held a valuation trial on April 11-12, and May 5, 2022. No fact witnesses testified. Eilat and Bayonne each offered testimony solely from a New Jersey certified general real estate appraiser. Both expert witnesses were accepted by the court, without objection, as experts in the field of real property valuation (the "expert" or "experts"). Both experts inspected the property, as well as its surrounding environs. The experts prepared appraisal reports expressing their opinions of the subject properties' true market values as of the October 1, 2016, October 1, 2017, October 1, 2018, October 1, 2019, and October 1, 2020, valuation dates.

In addition to the divergent positions on whether the subject properties should be considered as a single economic unit, the other main issues in dispute between the two experts concerned vacancy and collection loss, operating expenses, and the capitalization rate.

As of each valuation date, the subject properties' tax assessments, implied equalized values, and the experts' value conclusions are as follows:

---

[10] This figure was taken from a chart prepared by Bayonne's expert and admitted into evidence (D16) without objection.

*Lot 18*

| Tax Year | Tax Assessment | Director's Avg. ratio of Assessed to True Value | Implied Equalized Value | Chapter 123 Lower Limit Value | Chapter 123 Upper Limit Value | Eilat's Expert[11] | Bayonne's Expert |
|---|---|---|---|---|---|---|---|
| 2017 | $1,167,400.00 | 39.94% | $2,922,884.33 | $2,541,693.88 | $3,438,586.16 | $1,723,080.00 | $3,100,000.00 |
| 2018 | $1,167,400.00 | 36.88% | $3,165,401.30 | $2,752,652.68 | $3,723,763.96 | $1,777,575.00 | $3,200,000.00 |
| 2019 | $1,167,400.00 | 34.13% | $3,420,451.22 | $2,974,267.52 | $4,024,129.61 | $1,808,715.00 | $3,300,000.00 |
| 2020 | $3,566,000.00 | 100%[12] | $3,566,000.00 | $3,566,000.00 | $3,566,000.00 | $1,967,010.00 | $3,550,000.00 |
| 2021 | $3,566,000.00 | 95.69% | $3,726,617.20 | $3,566,000.00 | $4,384,066.88 | $2,078,595.00 | $3,800,000.00 |

---

[11] These numbers were calculated by applying the percentage of each property regarding the overall income. The appraiser stated in direct testimony that this is how he allocated property values to each lot. For Lot 18, this number equates to 51.9 percent of the value. The numbers stated during the testimony were rounded, whereas the numbers in the chart include exact calculations.

[12] 2020 was a revaluation year.

*Lot 20*

| Tax Year | Tax Assessment | Director's Avg. Ratio of Assessed to True Value | Implied Equalized Value | Chapter 123 Lower Limit Value | Chapter 123 Upper Limit Value | Eilat's Expert[13] | Bayonne's Expert |
|---|---|---|---|---|---|---|---|
| 2017 | $1,075,800.00 | 39.94% | $2,693,540.31 | $2,342,259.96 | $3,168,777.61 | $1,596,920.00 | $2,900,000.00 |
| 2018 | $1,075,800.00 | 36.88% | $2,917,028.20 | $2,536,665.88 | $3,431,578.95 | $1,647,425.00 | $3,000,000.00 |
| 2019 | $1,075,800.00 | 34.13% | $3,152,065.63 | $2,740,891.72 | $3,708,376.42 | $1,676,285.00 | $3,100,000.00 |
| 2020 | $2,697,100.00 | 100%[14] | $2,697,100.00 | $2,697,100.00 | $2,697,100.00 | $1,822,990.00 | $3,400,000.00 |
| 2021 | $2,697,100.00 | 95.69% | $2,818,580.83 | $2,697,100.00 | $3,315,834.77 | $1,926,405.00 | $3,600,000.00 |

**Highest and Best Use**

Both parties and the court agree that the highest and best use of the subject properties as vacant and as improved, are residential apartment facilities, and that the preferred method of appraisal is the income approach to valuation.

---

[13] These numbers were calculated by applying the percentage of each property regarding the overall income. The appraiser stated in direct testimony that this is how he allocated property values to each lot. For Lot 20, this number equates to 48.1 percent of the value. The numbers stated during the testimony were rounded, whereas the numbers in the chart include exact calculations.

[14] 2020 was a revaluation year.

**Plaintiff's Approach to Valuation**

Plaintiff's expert valued the subject properties as a single economic unit, utilizing the income capitalization approach.

*Income*

Plaintiff's expert used reported rental income to determine the Projected Gross Income ("PGI"); this was determined by adding the subject properties' rent rolls for 2016 through 2020. To determine the effective gross income, the vacancy and credit loss were deducted from the PGI. He then calculated the net operating income ("NOI") for each year by deducting the operating expenses from the effective gross income.

*Operating Expenses*

Plaintiff's expert utilized the relevant[15] operating expenses listed on Eilat's Form 8825. To confirm these values, he compared the expenses with two similar properties in Roselle Park and one similar property in Jersey City. Those calculations resulted in an expense ratio for the subject properties at 40.7%. Thereafter, he stabilized the operating expenses at 49.30 % of PGI by adjusting Management, Administration, Maintenance and Repairs, Sanitation, Miscellaneous, and Reserves, without backup data. This resulted in the following operating expenses: 2017 – $376,498; 2018 – $382,086; 2019 – $383,806; 2020 – $392,310; and 2021 – $406,810.

---

[15] Not all expense categories on Form 8825 are used for establishing market value under the income approach; for example, the depreciation expense was not included.

On cross examination it was disclosed that Eilat's expert prepared an April 15, 2020 appraisal report for a similar property in Bayonne (930 Kennedy) but chose not to use it as a comparable for the subject properties. In his 930 Kennedy property report, Eilat's expert's expense ratio was 25%.

*Vacancy and Collection Loss*

Eilat's expert utilized a 7.5% vacancy and credit loss based upon a comparison of the subject properties' collected rent to the annual rent roll. There was no independent data to confirm this vacancy rate in the market. In fact, market data indicated a much lower vacancy rate.

*Capitalization Rate*

Eilat's expert employed a band of investment technique[16] to derive a rounded base capitalization rate of 6.65% for 2017 and 2018, 6.70% for 2019, 6.50% for 2020, and 6.40% for 2021. The expert considered the following factors in his analysis: (1) mortgage interest rate; (2) loan to value ratio; (3) amortization period; (4) mortgage constant; and (5) equity rate.  Much of this information was derived from the Korpacz Real Estate Investor Survey, ACLI Investment Bulletin, and Real Estate Research Corporation "Real Estate Report" for all pertinent tax years. On cross examination, he acknowledged that he did not consider the 3.375 interest rate provided

---

[16] The band of investment technique is when the capitalization rates, which are attributable to components of a capital investment, are weighted and combined to derive a weighted-average attributable to the total investment.

11

by Regal Bank in its two 2020 3-million-dollar mortgages for each parcel when he determined his 2020 interest rate of 3.75.

Having determined NOI and a capitalization rate, Eilat's expert concluded market values for the subject properties as follows: $3,320,000 for 2017, $3,425,000 for 2018, $3,485,000 for 2019, $3,790,000 for 2020, and $4,005,000 for 2021. These values reflect the two subject properties as one economic unit. Thereafter, he allocated market values to Lot 18 and Lot 20 based upon their percentage of the PGI.

Eilat's expert found a market value for all tax years that was lower than the Chapter 123 lower limit value.[17]

**Defendant's Approach to Valuation**

Bayonne's expert supplied separate appraisal reports for Lots 18 and 20. Like plaintiff's expert, he also utilized the income approach to reach value.[18] The analyses described below were performed for each property separately.

*Income*

Defendant's expert utilized the rent rolls provided during discovery to calculate an average potential gross income for each year and property.

---

[17] See charts provided on pages 8 and 9.

[18] Defendant's expert also included the cost approach in his appraisal report to test the reasonableness of the values from the income approach.

12

*Vacancy and Collection Loss*

Bayonne's expert utilized a 2.5% rate for both properties, based on the rent rolls provided and his subjective analysis of prevailing market trends. There was no back-up data to support this rate.

*Operating Expenses*

Bayonne's expert rejected operating expenses listed on Eilat's Form 8825, finding that they were "concerning" and widely inconsistent in multiple relevant categories. Instead, he chose to utilize the 2018 expenses available to him of two similar Bayonne properties, and market data from the Institute of Real Estate Management ("IREM") and National Apartment Association ("NAA").

The NAA report included a 2017 survey of operating income and expenses for rental apartment communities; the expert focused on the average operating expenses for the garden apartments, which equated to $3,041 per unit for 2016. Bayonne's expert also relied on the IREM report, which displayed the management fees and leasing commission percentages in the first quarter of 2018 only; there were no reports for the other pertinent tax years.

Bayonne's expert adopted a stabilized operating expense of $3,000 per unit for all tax years and all units in both properties.

*Capitalization Rate*

Bayonne's expert also utilized the band of investment technique in reaching a capitalization rate for both properties. He calculated the mortgage capitalization rate by analyzing data from the ACLI Commercial Mortgage Commitments survey and RealtyRates.com. The ACLI survey included mortgage constant values from the 3rd quarter of 2016, 2017, 2018, 2019, and 2020, from the tables for apartments with loan sizes ranging from 2-4.99 million dollars and apartments located in the Middle Atlantic. To calculate the equity capitalization rate, defendant's expert viewed the market rates and bond yields, as well as the yield comparisons from the RERC Investment Survey and PwC Real Estate Investor Survey.

For Lots 18 and 20, the overall capitalization rate equated to 5.28% for tax years 2017 through 2021.

Once the NOI and capitalization rate were derived, Bayonne's expert determined the market values for Lots 18 and 20. The values for Lot 18 are $3,100,000 for 2017, $3,200,000 for 2018, $3,300,000 for 2019, $3,550,000 for 2020, and $3,800,000 for 2021. The values for Lot 20 are $2,900,000 for 2017, $3,000,000 for 2018, $3,100,000 for 2019, $3,400,000 for 2020, and $3,600,000 for 2021.

Only the 2020 and 2021 Lot 20 market values exceed the Chapter 123 upper limit values.[19]

---

[19] See charts on pages 8 and 9.

14

## II. Legal Analysis

### A. Single Economic Unit

Eilat takes the position that the subject properties are two parts of one entity, that are to be valued as one economic unit, followed by an allocation of assessment values. Accordingly, Eilat's expert rendered his opinion of value of the subject properties as one operating economic unit, and then allocated value based on each parcel's PGI. Eilat's expert relied upon the subject properties' common ownership, contiguous connection, and Eilat's accounting practice of combining both properties' expenses on Form 8825 of its federal tax returns.

Conversely, Bayonne asserts that each parcel is functionally separate from the other; therefore, Bayonne's expert appraised them individually. In support of its position, Bayonne offered evidence of independency through photographs of the subject properties' exteriors, both experts' testimonies regarding observations during inspections, and the existence of separate mortgages.

Unity of use is established when there is "a connection or relation of adaptation, convenience and actual . . . use to make the enjoyment of one [parcel] reasonably necessary to the enjoyment of the other [parcel] . . ." Manalapan v. Genovese, 187 N.J. Super. 516, 521 (App. Div. 1983). Thus when separately assessed parcels are integral parts of a single economic unit, an appraiser should develop an opinion of value that considers the entire economic operation and how the individual component parts contribute to the value of the whole. Authority for such an approach

15

can be found in Purex Corp. v. Paterson City, 8 N.J. Tax 121 (Tax 1986); Mobil Oil Corp. v. Greenwich Twp., 9 N.J. Tax 123 (Tax 1986); and Atlantic City v. Ginnetti, 17 N.J. Tax 354, 362-63 (Tax 1998), aff'd, 18 N.J. Tax 672 (App. Div. 2000).

The court finds that the subject properties are not joined in a unity of use and operations. Although the subject properties are contiguous and share a common ownership, the overwhelming evidence supports the conclusion that they are separate entities in all other respects. They function independently, are physically separated by a fence and hill, and possess separate entrances. Each building contains its own laundry room, and a parking lot with a space for each apartment. They share the same highest and best use as an apartment building, independent of each other. The ownership of one is not instrumentally connected to the effective operation of the other. The subject properties are separately mortgaged and may be separately sold without negatively impacting the other.

The requisite evidence to establish that the two parcels are functionally integrated occurs when each parcel is reasonably necessary to the use and enjoyment of the other. See Housing Authority of Newark v. Norfolk Realty Co., 71 N.J. 314, 325 (1976). Such evidence is lacking, and the court finds that the subject properties must be appraised individually.

## B. Presumption of Correctness

The court's analysis begins with the well-established principle that "[o]riginal assessments . . . are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of

Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme

Court has defined the parameters of the presumption as follows:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."
>
> [Id. at 373 (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413, (1985).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed

that governmental authority has been exercised correctly and in accordance with law." Pantasote,

100 N.J. at 413 (citing Powder Mill, I Assocs. v. Twp. of Hamilton, 3 N.J. Tax 439 (Tax 1981));

see Byram Twp. v. Western World, Inc., 111 N.J. 222, (1988). The presumption remains "in place

even if the municipality utilized a flawed valuation methodology, so long as the quantum of the

assessment is not so far removed from the true value of the property or the method of assessment

itself is so patently defective as to justify removal of the presumption of validity." Transcontinental

Gas Pipe Line Corp. v. Twp. of Bernards, 111 N.J. 507, 517 (1988) (citation omitted).

"In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the

case through the close of all proofs." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 377. In making

the determination of whether the presumption has been overcome, the court should weigh and

17

analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid.

The court must accept the proofs of the party challenging the assessment as true and accord that party all legitimate favorable inferences from that evidence. MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). The court is concerned with the existence of the evidence, not its weight. Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969). To overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488, (2000)).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-9, (App. Div. 1982) (citations omitted). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed, and the court need not proceed to making an independent determination of value. Ford Motor Co. v. Twp. of Edison, 127 N.J. 290, 312 (1992);

18

Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

At the conclusion of trial, counsel for Bayonne made a motion to dismiss plaintiff's tax appeals on the basis that the presumption of correctness had not been overcome, and that plaintiff's expert appraiser's opinion of value was unreliable and constituted a net opinion. The court initially denied the motion. However, on request, the court permitted counsel to submit briefs and closing statements. Bayonne's counsel filed a letter brief on May 16, 2022.

The court has reconsidered its decision on the record and finds that the presumption of validity attached to the assessments under review has not been overcome, by either Eilat or Bayonne.

Having already determined that the subject properties do not constitute one economic unit, the court now addresses the evidence related to the valuation of the subject properties individually. Here, the court agrees with both appraisal experts that the income capitalization approach is the most appropriate method to derive each parcel's estimated true market value.

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013); see Parkway Village Apartments Co. v. Cranford Twp., 8 N.J. Tax 430 (Tax 1985),

19

aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996).

Determining stabilized operating expenses is a crucial and necessary element critical to that analysis, as it is the means by which NOI is calculated.

The evidence presented by Eilat as to operating expenses is not reliable or credible. It is instead arbitrary, inconsistent, and irrelevant. No representative from Eilat testified at trial and the court lacks the ability to assess the credibility or reliability of any entries listed on the Form 8825. Likewise, the court lacks the ability to attribute actual expenses as to each separate property. The court also finds that the comparables from Roselle Park and Jersey City are irrelevant.

The court is particularly bothered by the several glaring errors on the Form 8825. The subject properties are categorized as "an apartment building." Also, the address of the property is incorrect. Finally, there is at least one easily quantifiable expense that is blatantly and substantially incorrect. Although a tax expense is not an element for the computation of an income approach appraisal, the figure reported in plaintiff's proofs is easily verified through a calculation involving two known factors – the assessment and the tax rate. There are without a doubt, unexplained substantial discrepancies between the actual property tax owed and the taxes claimed.

Bayonne's proofs related to the separate parcel's stabilized operating expenses are also problematic. The data employed by Bayonne's expert is limited to market data from 2016 and two

20

comparable properties in Bayonne from 2018. Most importantly, they fail to establish the existence of a debatable question as to the correctness of the assessment for any of the tax years in question, including the 2020 counterclaims.

Thus, after giving every positive inference to plaintiff, as is required at this juncture of the analysis, there is insufficient evidence to support a market value based on the income approach due to the lack of credible evidence regarding stabilized operating expenses. Therefore, the presumption of correctness has not been overcome for Eilat's appeals.

As for Bayonne, their expert's appraisal value only exceeds the Chapter 123 upper limit value for Lot 20 in tax years 2020 and 2021. As stated earlier, Bayonne's expert did not provide any documentation or market data to support a stabilized operating expense for those years and consequently, the requisite proofs have not been presented.

The court, as a result of the above, need not determine the true market value of the subject properties on the relevant valuation dates.

### III.     Conclusion

For the reasons expressed above, the court finds that the subject properties operate separately and individually and do not constitute one economic unit. After reviewing the evidence adduced at trial, the court finds that there is insufficient credible evidence for operating expenses, which is a fatal flaw in finding value based on the income approach, as NOI cannot be reliably determined. Therefore, the presumption of validity attached to the original assessments has not

21

been overcome by either the plaintiff or the defendant for all years at issue.


/s/ Mary Siobhan Brennan
Hon. Mary Siobhan Brennan, J.T.C.

22