TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

December 15, 2017

Robert F. Renaud, Esq.
Palumbo, Renaud & DeAppolonio, LLC
190 North Avenue East
Cranford, New Jersey 07016

Carleton Kemph, Esq.
Genova Burns LLC
494 Broad Street
Newark, New Jersey 07102

   Re: Roselle Borough v. Mamco Association c/o Alman Group LLC
      Docket Nos. 016723-2013 & 016726-2013

Dear Mr. Renaud and Mr. Kemph:

This letter constitutes the court's opinion following trial of the above local property tax appeals. Plaintiff, Roselle Borough, a municipal corporation of the State of New Jersey ("plaintiff"), challenges the 2013 Memorandum of Judgments issued by the Union County Board of Taxation, reducing the 2013 tax year local property tax assessments on the improved properties owned by defendant, Mamco Association ("defendant").

For the reasons stated more fully below, the court affirms the 2013 Union County Board of Taxation Memorandum of Judgments.

## I. Procedural History and Findings of Fact

As of the October 1, 2012 valuation date, defendant was the owner of the real property and improvements located at 217-221 Highland Parkway, and 224-240 Highland Parkway (also known

as 228 Highland Parkway), in the Borough of Roselle, County of Union, and State of New Jersey. The properties are identified on Roselle Borough's municipal tax map as Block 2902, Lot 2.03 ("217-221 Highland Parkway") and Block 2903, Lot 1 ("224-240 Highland Parkway") (217-221 Highland Parkway and 224-240 Highland Parkway shall be collectively referred to as the "subject properties").

217-221 Highland Parkway is a rectangular shaped .337-acre lot, with approximately 146.77 feet of frontage along the northerly side of Highland Parkway. As of the valuation date, it was improved with an 11,707 square foot masonry structure, constructed in 1968.[1] The structure consists of approximately 5,137 square feet, or 44% warehouse area, and 6,570 square feet, or 56% finished office area, contained in two-stories. The office area consists of finished sheetrock walls, carpeted and tile flooring, acoustical tile ceilings, overhead fluorescent lighting, two conference rooms, seven offices, two kitchenettes, two half bathrooms, and a storage room. The office area contains central heating and air conditioning. The warehouse contains 20-foot high ceilings, overhead heating units, two drive-in doors, a locker room, and a half bathroom. Alongside the building is a fenced yard and driveway that also fronts Highland Parkway. Vehicle parking is afforded along Highland Parkway and in an 8' to 10' paved area between the front of the building and the lot line.

224-240 Highland Parkway is an irregular, triangular shaped .337-acre lot, with approximately 234.56 feet of frontage along the southerly side of Highland Parkway. As of the valuation date, it was improved with an 11,050 square foot masonry warehouse structure,

---

[1] During trial, conflicting testimony was offered by plaintiff and defendant regarding the gross building area of 217-221 Highland Parkway. Plaintiff's appraiser measured the interior warehouse area and exterior of the building to calculate his estimated 11,707 square foot gross building area. In addition, plaintiff submitted a July 5, 2000 plot plan, prepared by defendant's engineer, disclosing that the structure contained 11,707 square feet. Defendant offered that the structure consists of 11,320 square feet, based on wheel measurements of its appraiser. The court finds plaintiff's evidence is more accurate, and concludes that 217-221 Highland Parkway consists of 11,707 square feet of gross building area.

constructed in 1979.[2]  The building is equipped with five (5) drive-in doors.  However, access within the interior of the warehouse is limited, as the building is divided into several individual sections, requiring warehouse occupants to access the separate warehouse areas from the exterior. The warehouse contains 20-foot high ceilings, and two overhead heating units.  The warehouse contains a small office area.  Both plaintiff's appraiser and defendant's appraiser expressed that 224-240 Highland Parkway is inferior, in condition, use, and functionality to 217-221 Highland Parkway.

As of the valuation date, the subject properties were occupied by Garden State Brickface ("Garden State Brickface"), an entity whose principal owner, is also one of the principals of defendant.  Garden State Brickface occupied and used the subject properties as an office, a mixing area, and for storage of construction materials, equipment, and trucks.

The subject properties are located in plaintiff's I-Industrial zoning district, with permitted light industrial uses, including office buildings for executive, engineering and administrative purposes, scientific or research laboratories, manufacturing of light machinery, fabrication of metal, wood, and paper products, etc.  Thus, use of the subject properties is legally conforming. The subject properties are located in Flood Zone X, denoting an area of minimal flooding risk.

For the 2013 tax year, the subject properties bore the following tax assessments:

| (217-221 Highland Parkway) | (224-240 Highland Parkway) |
|---|---|
| Land:　　　　 $150,000 | Land:　　　　 $164,000 |
| Improvement: $285,900 | Improvement: $152,400 |
| Total:　　　　 $435,900 | Total:　　　　 $316,400 |

---

[2] During trial, conflicting testimony was offered by plaintiff and defendant regarding the gross building area of 224-240 Highland Parkway.  Pages 18 and 41 of plaintiff's appraisal report reflect that the structure contains a gross building area of 11,050 square feet.  However, during trial plaintiff's appraiser offered testimony that 224-240 Highland Parkway consists of 11,320 square feet.  Defendant offered that the structure contains 11,050 square feet, based on the wheel measurements of its appraiser.  The court finds defendant's evidence is more accurate, and concludes that 224-240 Highland Parkway consists of 11,050 square feet of gross building area.

Defendant filed petitions of appeal with the Union County Board of Taxation (the "Board) challenging the 2013 tax year assessments. Following a hearing, the Board entered Memorandum of Judgments (the "Judgments"), reducing the 2013 tax year local property tax assessments on the subject properties as follows:

| (217-221 Highland Parkway) | (224-240 Highland Parkway) |
|---|---|
| Land: $150,000 | Land: $164,000 |
| Improvement: $195,700 | Improvement: $ 78,000 |
| Total: $345,700 | Total: $242,000 |

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for plaintiff was 57.61% for the 2013 tax year. See N.J.S.A. 54:1-35a(a). Applying the average ratio to the local property tax assessments and to the Judgments produces the following implied equalized values for the subject properties:

|  | Implied equalized value of tax assessment | Implied equalized value of Judgment |
|---|---|---|
| 217-221 Highland Parkway | $756,639.47 | $600,069.43 |
| 224-240 Highland Parkway | $549,210.20 | $420,065.96 |

Plaintiff filed timely Complaints with the Tax Court contesting the Board's Judgments. The defendant did not file any Counterclaims.

During trial, plaintiff and defendant each offered testimony from State of New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the property valuation field. Each appraiser prepared an appraisal report expressing an opinion of the true market value of the subject properties. The appraisers offered their opinions that the subject properties had a true market value, as of the October 1, 2012 valuation date, as follows:

|  | Plaintiff's appraiser | Defendant's appraiser |
|---|---|---|
| 217-221 Highland Parkway | $870,000 | $550,000 |
| 224-240 Highland Parkway | $672,000 | $400,000 |

Plaintiff elicited testimony from defendant's appraiser during trial that in or about 2015, 217-221 Highland Parkway was offered for lease or for sale. Moreover, plaintiff submitted copies of SR1A forms reflecting that 217-221 Highland Parkway sold on August 31, 2015, and 224-240 Highland Parkway sold on February 24, 2016.

## II. Conclusions of Law

### a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). The complaining party bears the burden of proving that the county board judgment, or original tax assessment, is erroneous. Ford Motor Co. v. Edison, 127 N.J. 290, 313-4 (1992). See also Rodwood Gardens, Inc. v. Summit, 188 N.J. Super. 34, 38 (App. Div. 1982) (concluding that on appeal to the Tax Court "a similar presumption [of correctness] attaches to the county board judgment.") Thus, when a municipality seeks to "establish a value for the taxpayer's property which exceeds the value established by the county board's judgment, the taxpayer is 'favored by the nonstatutory presumption of correctness of the county board's judgment.'" Warren Twp. v. Suffness, 225 N.J. Super. 399, 415 (App. Div.), certif. denied, 113 N.J. 640 (1988) (quoting Rumson Bor. v. Peckham, 7 N.J. Tax 539, 549 (1985)).

The presumption of correctness stands "until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Township v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). The complaining party can only rebut the presumption by introducing "cogent evidence" of true value; that is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the challenging party's proofs, the court must be presented with evidence that raises a "debatable

question" as to the validity of the county board judgment or tax assessment. <u>MSGW Real Estate Fund, LLC</u>, <u>supra</u>, 18 <u>N.J. Tax</u> at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." <u>Id.</u> at 376 (citing <u>Brill v. Guardian Life Insurance Co. of America</u>, 142 <u>N.J.</u> 520 (1995)). The evidence presented, when viewed under the <u>Brill</u> standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment,'" or county board judgment. <u>West Colonial Enters, LLC v. City of East Orange</u>, 20 <u>N.J. Tax</u> 576, 579 (Tax 2003) (quoting <u>Lenal Properties, Inc. v. City of Jersey City</u>, 18 <u>N.J. Tax</u> 405, 408 (Tax 1999), <u>aff'd</u>, 18 <u>N.J. Tax</u> 658 (App. Div. 2000), <u>certif.</u> <u>denied</u>, 165 <u>N.J.</u> 488 (2000)). "Only after the presumption is overcome with sufficient evidence. . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" <u>Greenblatt v. Englewood City</u>, 26 <u>N.J. Tax</u> 41, 52 (Tax 2011) (quoting <u>Rodwood Gardens, Inc.</u>, <u>supra,</u> 188 <u>N.J. Super.</u> at 38-39). Hence, even in the absence of a motion to dismiss under <u>R.</u> 4:37-2(b), the court is nonetheless required to determine if the plaintiff has overcome the presumption of correctness. If the court independently concludes that plaintiff has not carried the requisite burden, dismissal of the action is warranted under <u>R.</u> 4:40-1 and the trial court need not engage in an evaluation of the evidence to make an independent determination of value.

According plaintiff all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that plaintiff produced cogent evidence sufficient to overcome the presumption of correctness that attaches to the Union County Board of Taxation

6

Judgments. If accepted as true, the opinions of plaintiff's appraiser and the facts upon which he relied raise debatable questions regarding the correctness of the Judgments for the 2013 tax year.

However, concluding that the presumption of correctness has been overcome, does not equate to a finding by the court that either a county board judgment, or a tax assessment, is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., supra, 127 N.J. at 312. Although the proofs, when measured against the liberal standards employed in evaluating a motion under R. 4:37-2(b), may be sufficient to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remains with the complaining party "to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985)).

b. Highest and Best Use

An indispensable element not only to principles of property valuation, but to the determination of the true market value of property is discerning its highest and best use. Ford Motor Co., supra, 10 N.J. Tax at 161, aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., supra, 10 N.J. Tax at 161.

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2)

physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Here, both appraisers opined that the highest and best use of the subject properties, "as improved," are their current use as a warehouse with offices (217-221 Highland Avenue) and as a warehouse (224-240 Highland Parkway).

c. Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Township, 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Township, 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Township, 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986). However, when the proofs submitted in support of one approach overshadow those submitted in support of any other approach, the court may conclude which approach should prevail. ITT Continental Baking Co., supra, 1 N.J. Tax 244; Pennwalt Corp. v. Holmdel Township, 4 N.J. Tax 51 (Tax 1982).

8

Here, both appraisers considered all three approaches to value. However, plaintiff's appraiser rejected the cost and sales comparison approaches to value, as unreliable, and relied exclusively on the income-capitalization approach. Conversely, defendant's appraiser utilized all three approaches to value, placing equal weight on the income-capitalization and sales comparison approaches to value. Although included in his appraisal reports, defendant's appraiser attributed no weight to the cost approach.

1. Income Capitalization Approach

When a property is income-producing, the income capitalization approach is the favored method for determining the estimated value of that property. Parkway Village Apartments Co. v. Township of Cranford, 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert[s] these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013). Central to the income capitalization approach, is the concept of anticipation, which is a process designed to forecast future economic benefits, and convert those benefits into a present value estimate. Id. at 440. Stated differently, the income capitalization approach converts the benefits to be realized from a future stream of income and reversionary benefit into a present value.

The first, and often most critical step under the income-capitalization approach, is forecasting a property's potential gross income. This requires an appraiser to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village

Apartments, supra, 108 N.J. at 270; see also New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537 (1963).

### a. Market Rent

The term market rent or economic rent, refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, supra, at 121-22. The market rent ascribed to a property under the income-capitalization approach may differ substantially from the "contract rent," or actual rent collected by the owner of the property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972).

### 1. Plaintiff's appraiser

In determining a market rent for 217-221 Highland Parkway, plaintiff's appraiser relied upon five (5) leases of industrial warehouses. Two of the leased properties are located in Linden, and three are located in Roselle. Additionally, in determining a market rent for 224-240 Highland Parkway, plaintiff's appraiser relied upon seven (7) leases of industrial warehouses. The seven leased properties are located in the following municipalities: one in Roselle, four in Linden, one in Springfield, and one in Elizabeth. In plaintiff's appraiser's opinion, a market exists for the "lower end industrials where uses are more permissive." According to plaintiff's appraiser, that market exists in Roselle, Linden, Carteret, and parts of Woodbridge and Edison.

In calculating the annual rent and rent per square foot for the comparable leases, plaintiff's appraiser averaged the aggregate annual rent over the life of its lease. Plaintiff's appraiser offered that most of the comparable lease information was obtained from property he inspected or

appraised during the course of his representation of Roselle and Linden, in defense of tax appeal matters. The following table contains the comparable leases relied on by plaintiff's appraiser:

| Lease | Address | Use Occupancy | Constructed Renovated Condition | Gross Bldg. Size Leased Area % Office Area | Lease date Lease term Lease type | Avg. annual rent Avg. rent psf. |
|---|---|---|---|---|---|---|
| #1 | Brunswick Ave. Linden, NJ | Multi-tenanted warehouse 2-story former manufacturing facility | 1900 Renovated 1986/1987 Average | 523,842 sq. ft. 2,000 sq. ft. 20% Office | 2/1/2012 5 years Net | $25,960.00 $7.98 psf |
| #2 | Tremley Point Rd. Linden, NJ | Multi-tenanted warehouse 14 loading dock doors 7 drive-in doors | 1928 Renovated 2001 Average | 167,000 sq. ft. 12,648 sq. ft. 15% Office | 8/1/2011 5 years Net | $92,056.00 $7.28 psf |
| #3 | Cox Street Roselle, NJ | Multi-tenanted warehouse Shared overhead doors | 1955 Renovated 2009 Average | 43,560 sq. ft. 23,900 sq. ft. 5% Office | 10/30/2009 5 years Net | $52,768.00 $7.54 psf |
| #4 | W 1st Avenue Roselle, NJ | Multi-tenanted warehouse | 1950 Average | 8,000 sq. ft. 3,000 sq. ft. 3% Office | 9/15/2009 5 years Mod. Gross | $23,200.00 $7.73 psf |
| #5 | Cox Street Roselle, NJ | Multi-tenanted warehouse 2 loading docks | 1987 Average | 51,906 sq. ft. 10,000 sq. ft. 50% Office | 9/1/2008 5 years Net | $92,700.00 $9.27 psf |
| #6 | Brunswick Ave. Linden, NJ | Multi-tenanted warehouse 2-story former manufacturing facility | 1900 Renovated 1986/1987 Below average | 523,842 sq. ft. 14,977 sq. ft. | 06/1/2008 5 years Net | $91,420.00 $6.10 psf |
| #7 | Lower Road Linden, NJ | 1 & 2 story Multi-tenanted warehouse | 1962 Average | 213,749 sq. ft. 8,832 sq. ft. | 4/5/2010 2 years Net | $52,992.00 $6.00 psf |
| #8 | Cox Street Roselle, NJ | Multi-tenanted warehouse 2 loading docks | 1987 Average | 51,906 sq. ft. 6,500 sq. ft. | 1/1/2008 1.5 years Net | $42,250.00 $6.50 psf |
| #9 | Fadem Road Springfield, NJ | Multi-tenanted warehouse | 1962 Average | 122,222 sq. ft. 7,200 sq. ft. | 3/1/2011 5 years Net | $36,000.00 $5.00 psf |
| #10 | Dowd Avenue Elizabeth, NJ | Single tenanted warehouse 1 drive-in door 2 loading dock doors | 1950 Average | 14,390 sq. ft. 14,390 sq. ft. | 1/30/2009 3 years Net | $90,000.00 $6.25 psf |
| #11 | W Elizabeth Ave. Linden, NJ | Multi-tenanted warehouse | 1989 Good | 79,102 sq. ft. 10,136 sq. ft. | 8/1/2009 5 years Net | $63,350.00 $6.25 psf |
| #12 | Tremley Point Rd. Linden, NJ | Multi-tenanted warehouse | 1975 Average | 160,543 sq. ft. 19,620 sq. ft. | 8/1/2010 2 years Net | $92,482.00 $4.71 psf |

Plaintiff's appraiser applied adjustments to the comparable leases to account for perceived differences in physical age and condition, economic size, and expense allocation. Comparable lease 2 was adjusted -5% for physical age and condition, resulting in an adjusted rent of $6.92 psf. Comparable lease 3 was adjusted -5% for physical age and condition, resulting in an adjusted rent of $7.16 psf. Comparable lease 4 was adjusted -15% for expense allocation, to account for it being a modified gross rental, resulting in an adjusted rent of $6.57 psf. Comparable lease 5 was adjusted -15% for physical age and condition, resulting in an adjusted rent of $7.88 psf. Comparable lease 7 was adjusted +5% for physical age and condition and -5% for economic size, resulting in an adjusted rent of $6.00 psf. Comparable lease 8 was adjusted -5% for physical age and condition and -5% for economic size, resulting in an adjusted rent of $5.85 psf. Comparable lease 9 was adjusted -5% for economic size, resulting in an adjusted rent of $4.75 psf. Comparable lease 11 was adjusted -5% for physical age and condition, resulting in an adjusted rent of $5.94 psf.

After adjustments to comparable leases 1 to 5, the resulting range of economic rents was $6.57 to $7.98. Plaintiff's appraiser concluded a market rent of $7.25 psf for 217-221 Highland Parkway. Plaintiff's appraiser multiplied his concluded $7.25 psf market rent by the 11,707 gross building area of 217-221 Highland Parkway to determine Gross Potential Income of $84,875.00.

After adjustments to comparable leases 6 to 12, the resulting range of economic rents was $4.71 to $6.10. Plaintiff's appraiser concluded a market rent of $5.60 psf for 224-240 Highland Parkway. Plaintiff's appraiser multiplied his concluded $5.60 psf market rent by a gross building area of 11,320 square feet, to determine Gross Potential Income of $63,392.00 for 224-240 Highland Parkway.[3]

---

[3] As stated above, plaintiff's appraisal report and plaintiff's appraiser's trial testimony offered conflicting evidence regarding the gross building area attributable to 224-240 Highland Parkway.

Plaintiff's appraiser then applied a vacancy and collection loss factor of 5% to the Gross Potential Income calculations for 217-221 Highland Parkway and 224-240 Highland Parkway to determine their Effective Gross Incomes.

For 217-221 Highland Parkway, plaintiff's appraiser applied stabilized management fees and leasing expenses of 9%, and reserves of 2% of Effective Gross Income. However, for 224-240 Highland Parkway, plaintiff's appraiser applied stabilized management fees of 3%, leasing expenses of 4%, and reserves of 1% of Effective Gross Income.

Plaintiff's appraiser next determined a capitalization rate of 8.25% employing the band of investment technique, and applied it to the subject properties Net Operating Income. In determining his capitalization rate, plaintiff's appraiser consulted the American Council of Life Insurance ("ACLI") tables for the 3rd Quarter of 2012, PWC-Korpacz surveys of the National Warehouse market for the 3rd Quarter 2012, and Real Estate Research Corporation's ("RERC") "Snapshot OAR" for the 3rd Quarter 2012. Although the ACLI tables were not reproduced in plaintiff's appraisal report, according to plaintiff's appraiser, they disclosed that interest rates for "Grade A" warehouses ranged from 6.24% to 8.79%, with an average rate of 6.95%.[4]

Plaintiff's appraiser concluded a value of $870,000 for 217-221 Highland Parkway, and a value of $672,000 for 224-240 Highland Parkway, as of the October 1, 2012 valuation date.

2. Defendant's Appraiser

In determining his market rent, defendant's appraiser relied upon four (4) leases of industrial warehouses that he deemed comparable to both 217-221 Highland Parkway and 224-

---

[4] Plaintiff's appraisal report for 224-240 Highland Parkway contained ACLI tables for Commercial Mortgage Commitments for the 3rd Quarter 2013. Plaintiff's appraisal report for 217-221 Highland Parkway did not contain any ACLI tables. Neither of plaintiff's appraisal reports contained the RERC surveys.

240 Highland Parkway. One of the comparable leased properties is located in Kenilworth and three are located in Linden.

| Lease | Address | Use Occupancy | Condition | Gross Bldg. Size Leased Area | Lease date Lease type | Rent psf. |
|---|---|---|---|---|---|---|
| #1 | Michigan Ave. Kenilworth, NJ | Single tenanted warehouse 1-story with 13% office area | Average | 23,000 sq. ft. 23,000 sq. ft. | 12/29/2011 Net | $4.80 psf |
| #2 | 1418 E. Linden Ave. Linden, NJ | Single tenanted warehouse 1-story | Average | 20,056 sq. ft. 20,056 sq. ft. | 9/2011 Net | $4.50 psf |
| #3 | 1375 E. Linden Ave. Linden, NJ | Single tenanted warehouse 1-story | Average | 13,857 sq. ft. 13,857 sq. ft. | 1/2012 Net | $5.00 psf 2 months free rent |
| #4 | 340 S. Stiles St. Linden, NJ | Single tenanted warehouse 1-story | Average | 28,729 sq. ft. 28,729 sq. ft. | 1/2012 Net | $4.01 psf 2 months free rent |

In performing his analysis of 217-221 Highland Parkway, defendant's appraiser applied a -10% location adjustment to comparable lease 1, resulting in an adjusted rent of $4.32 psf. No other adjustments were made to the comparable leases by defendant's appraiser for 217-221 Highland Parkway. The resulting range of adjusted economic rents was $4.01 to $5.00 psf. Defendant's appraiser concluded a market rent of $4.50 psf for 217-221 Highland Parkway. Defendant's appraiser then multiplied his concluded $4.50 psf market rent by his estimated gross building area of 11,320 square feet, to determine a Gross Potential Income of $50,940.00 for 217-221 Highland Parkway.

In performing his analysis of 224-240 Highland Parkway, defendant's appraiser applied a -10% location adjustment to comparable lease 1, resulting in an adjusted rent of $4.32 psf. In addition, defendant's appraiser applied a -15% condition adjustment to comparable leases 1, 2, 3, and 4. The resulting range of adjusted economic rents was $3.41 to $4.25 psf. Defendant's appraiser concluded a market rent of $3.75 psf for 224-240 Highland Parkway. Defendant's

14

appraiser multiplied his concluded $3.75 psf market rent by the gross building area of 11,050 square feet, to determine a Gross Potential Income of $41,438.00 for 224-240 Highland Parkway.

Defendant's appraiser applied an 8% vacancy and collection loss factor to the Gross Potential Income for both 217-221 Highland Parkway and 224-240 Highland Parkway to determine the Effective Gross Income for the subject properties. Defendant's appraiser then applied stabilized leasing expenses of 2.5%, reserves of 3%, and management fees of 5% of Effective Gross Income. In addition, defendant's appraiser deducted a stabilized expense for professional fees of $2,500.

Defendant's appraiser determined a capitalization rate of 8.33%, employing the band of investment technique. In determining his capitalization rate, defendant's appraiser consulted the ACLI tables for Commercial Mortgage Commitment for the 3rd Quarter of 2012.[5]

Defendant's appraiser concluded a value of $485,000 for 217-221 Highland Parkway, and a value of $390,000 for 224-240 Highland Parkway, as of the October 1, 2012 valuation date.

b. Adjustments

Adjustments must have a foundation obtained from data extracted from the marketplace, market-derived sources or objective data, and not be based on subjective observations and/or personal experiences. An appraiser's adjustments "must have a foundation obtained from the market. . ." Greenblatt, supra, 26 N.J. Tax at 55. "[T]he opinion of an expert depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Ibid. When an expert "offers an opinion without providing specific underlying reasons. . . he ceases to be an aid to the trier of fact."

---

[5] Defendant's appraisal report for 217-221 Highland Parkway contained the ACLI tables for Commercial Mortgage Commitments for the 3rd Quarter 2011. Defendant's appraisal report for 224-240 Highland Parkway contained the ACLI tables for Commercial Mortgage Commitments for the 3rd Quarter 2012.

Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div. 1996), certif. denied, 145 N.J. 374 (1996)). The expert is required to "give the why and wherefore of his expert opinion, not just a mere conclusion." Ibid. When an expert's opinion lacks a reliable foundation, supported by facts and market data, "the court cannot extrapolate value." Inmar Associates v. Edison Township, 2 N.J. Tax 59, 66 (Tax 1980). Thus, when an expert does not provide a sufficient explanation for his adjustments, rooted in fact, observation, and an analysis of market data, "the opinion of the expert is entitled to little weight in this regard." Dworman v. Tinton Falls, 1 N.J. Tax 445, 458 (Tax 1980) (citing to Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

Here, neither plaintiff's appraiser, nor defendant's appraiser offered any meaningful evidence, facts, data, or testimony to the court supporting their adjustments for economic size, age and condition, or location.

In plaintiff's appraiser's "judgment," 217-221 Highland Parkway was "inferior" to comparable leases 2, 3, and 5, thus he applied physical age and condition adjustments of -5% to lease 2, -5% to lease 3, and -15% to lease 5. Similarly, in plaintiff's appraiser's opinion, the condition of 224-240 Highland Parkway was "superior" to comparable lease 7, and "inferior" to comparable leases 8 and 11, thus he applied physical age and condition adjustments of +5% to comparable lease 7, -5% to comparable lease 8, and -5% to comparable lease 11.

According to plaintiff's appraiser, he inspected all the comparable leased properties, but "cannot describe to the court everything that I see, it is a feeling that I see, it is a gut feeling of what I am seeing, I describe it as best as I can, as objectively as I can . . . I take some pictures and I go in and look at the properties." However, other than the appraiser's subjective "judgment" and "gut feeling," no detailed testimony was elicited from plaintiff's appraiser, nor was any description

offered in his appraisal report providing the court with any meaningful insight into the alleged differences or variations in condition that plaintiff's appraiser observed. In fact, in describing the age and condition adjustments, plaintiff's appraisal report states only that "[t]he subject is superior to lease 2 and inferior to leases 3 and 6." Notwithstanding plaintiff's appraisal report's notation (which would require a correction of the adjustment to lease 2 from -5% to +5%), plaintiff's appraiser did not identify any physical characteristics, and offered no description of the varying conditions he observed between the properties. Thus, the court was deprived of the opportunity to fully consider, evaluate, and accord any weight to the adjustment evidence.

Moreover, plaintiff's appraiser did not identify any analysis, studies, surveys, or pinpoint any data that he extracted from the market on which his physical age and condition, or economic size adjustments were based. In sum, no data, evidence, or testimony was offered by plaintiff's appraiser providing any objective market support for his adjustments.

In plaintiff's appraiser's opinion, 224-240 Highland Parkway was inferior in size to comparable leases 7, 8, and 9, thus he applied an -5% size adjustment. This court has observed that an inverse relationship can exist between leased area and rental values. See VBV Realty, LLC v. Scotch Plains Twp., 29 N.J. Tax 548, 570 (2017). This principle expresses that the smaller the leased area, the higher the rental value per square foot, and the larger a leased area, the lower the rental value per square foot. However, plaintiff's appraiser offered no evidence to support his conclusion that comparable leases 7, 8, and 9, comprising respective rental areas of 8,832 square feet (20% smaller), 6,500 square feet (40% smaller), and 7,200 square feet (35% smaller), all warranted the same -5% size adjustment, or that a -5% adjustment appropriately accounted for the differences in size. Additionally, the court observes that comparable lease 12 consists of a rental area of 19,620 square feet, or approximately 77% larger than 224-228 Highland Parkway, however

17

plaintiff's appraiser did not apply any upward size adjustment to account for this material deviation.

The court further highlights that comparable lease 3 was 40% smaller than 217-221 Highland Parkway, and comparable lease 9 was 35% smaller than 224-240 Highland Parkway, however plaintiff's appraiser applied a -5% size adjustment only to comparable lease 9, but made no size adjustment to comparable lease 3. In addition, comparable lease 1 was 2,000 square feet, or approximately 83% smaller than 217-221 Highland Parkway, however, plaintiff's appraiser made no downward adjustment to comparable lease 1 to account for this significant size deviation.

Similarly, defendant's appraiser offered only the rationale for his adjustments, but offered no market derived data or objective evidence supporting his adjustment calculations. Defendant's appraiser concluded that comparable lease 1 was "superior" in location to the subject properties, warranting a -10% adjustment. However other than citing the subject properties distance to the New Jersey Turnpike, defendant's appraiser offered no explanation what made the comparable lease locations superior, nor how he derived that a -10% adjustment accurately accounts for the perceived superiority in location. In fact, during cross-examination, defendant's appraiser was seemingly unaware that the subject properties may be located closer to New Jersey Turnpike exit ramps than the comparable leased properties.

In comparing and contrasting the condition of 224-240 Highland Parkway, defendant's appraiser posited that comparable leases 1, 2, 3, and 4 were in "average" condition, yet 224-240 Highland Parkway was in "below avg" condition. Although defendant's appraiser offered testimony regarding the interior condition he observed in 224-240 Highland Parkway, defendant's appraiser offered no testimony explaining or describing for the court the interior condition of comparable leases 1, 2, 3, and 4, or the notable condition differences between the properties. The

18

court further highlights that only a single, black-and-white exterior photo of each comparable lease was included in defendant's appraisal report from which the court could not accurately discern any differences in quality or condition. Additionally, defendant's appraiser offered no market-derived or extracted data or information in support of his conclusion that a -15% adjustment accurately and appropriately accounted for the perceived condition differences between 224-240 Highland Parkway and comparable leases 1, 2, 3, and 4.

Moreover, the court observes that leased area of defendant's comparable lease 1 is approximately 100% larger than the subject properties, comparable lease 2 is approximately 71% larger than the subject properties, and comparable lease 4 is approximately 145% larger than the subject properties. However, defendant's appraiser failed to account for or address, in either his appraisal report or testimony before the court, the size disparity that exists between comparable leases 1, 2, and 4 and the subject properties. Defendant's appraiser made no adjustment for these significant size disparities, and seemingly ignored their size differences in arriving at a market rent.

Finally, defendant's appraiser offered testimony that industrial warehouses that possess a lower percentage of finished ancillary office space are less valuable than industrial warehouses possessing a higher percentage of finished ancillary office space. However, defendant's appraiser offered no evidence, either in his appraisal report or in his testimony to the court, regarding the finished office areas in comparable leases 1, 2, 3, or 4. Therefore, the court is unable to conclude with any degree of certainty, which comparable lease was competitive in the marketplace with either 217-221 Highland Parkway or 224-240 Highland Parkway, as of the October 1, 2012 valuation date.

For the above stated reasons, including plaintiff's appraiser's seemingly inconsistent application of size adjustments, the court finds both plaintiff's and defendant's appraisers adjustments inherently unreliable. Neither plaintiff's appraiser, nor defendant's appraiser produced or presented the court with any analysis, studies, surveys, or pinpointed any extracted market data supporting their adjustments. Additionally, ignoring both plaintiff's and defendant's appraisers adjustments would be inappropriate, as that would fail to recognize the differences that exist between the properties. Accordingly, without adequate evidence to account for the differences between the subject properties and the comparable leases, the court accords no weight to either plaintiff's comparable leases, or defendant's comparable leases.

Thus, without adequate credible evidence of market or economic rent, the court is unable to determine the fair market value of the subject properties employing the income-capitalization approach.

2. Sales Comparison Approach

According to defendant's appraiser, the "market" or sales comparison approach is practical to valuing the subject properties because they are not located in large industrial warehouse parks, and typically, these types of warehouse units are owner-occupied.

The sales comparison approach derives an opinion of market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." The Appraisal of Real Estate, supra, at 377. Like the income capitalization approach, the sales comparison approach requires an appraiser to dissect and weigh market data, including trends in the marketplace, to derive a credible opinion of value. The appraiser must engage in a "comparative analysis of properties" and focus on the "similarities and differences that affect value. . . which may include variations in property rights, financing, terms, market conditions and

physical characteristics." Id. at 378. When credible and reliable market data is available, the sales comparison approach "is the most straight forward and simple way to explain and support an opinion of market value." Greenblatt, supra, 26 N.J. Tax 41.

In performing his sales comparison approach, defendant's appraiser reviewed sales of industrial warehouses in Union County, focusing on five properties that sold between November 2011 and December 2012. Defendant's appraiser utilized the same five sale transactions to derive a value for both 217-221 Highland Parkway and 224-240 Highland Parkway. The five sale transactions were located in Linden, Elizabeth, Union, Berkeley Heights, and Plainfield. The unadjusted prices of the five sale transactions ranged from $48.15 to $59.52 per square foot. Defendant's appraiser applied adjustments to the comparable sales to account for perceived differences in location, condition, percentage of office area, and building coverage.

For 217-221 Highland Parkway, after adjustments, the adjusted sale prices of the comparable sale transactions ranged from $46.12 to $63.78 per square foot. Ultimately, defendant's appraiser concluded a fair market value of $54.00 per square foot. The appraiser then applied that figure to his estimated gross building area, which he calculated at 11,320 square feet, to arrive at a concluded value of $610,000, as of the October 1, 2012 valuation date.

For 224-240 Highland Parkway, after adjustments, the adjusted sale prices of the comparable sale transactions ranged from $29.18 to $47.03 per square foot. Ultimately, defendant's appraiser concluded a fair market value of $37.00 per square foot. The appraiser then applied that figure to the gross building area of 11,050 square feet, to arrive at a concluded value of $410,000, as of the October 1, 2012 valuation date.

When undertaking the sales comparison approach to value appraisers must adhere to "systematic procedure[s]." The Appraisal of Real Estate, supra, at 381. Appraisers must conduct

research of the competitive marketplace for "information on properties that are similar to the subject property" and that have recently sold. Ibid. A crucial element of this investigation and research involves the data verification process. An appraiser must verify the integrity of the information by "confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations." Ibid. During the data verification process an appraiser must "elicit additional information about the property such as buyer motivation, economic characteristics, [and] value component allocations. . . to ensure that comparisons are credible." Ibid. The process demands an appraiser "verify information with a party to the transaction to ensure its accuracy and gain insight into the motivation behind each transaction." Id. at 385. An appraiser must endeavor to confirm "statements of fact with the principals to the transaction. . . or with brokers, closing agents, or lenders involved." Ibid.

Here, both direct examination and cross-examination revealed that defendant's appraiser did not speak with any transaction participant involving comparable sale 3 or comparable sale 4. The solitary source of his knowledge and information regarding such sales was his review of Costar listings, the deed, and public tax records. Our Legislature has mandated that, in Tax Court proceedings, any person being offered as a witness with respect to the review of a local property tax assessment must possess information or knowledge regarding comparable properties acquired from owners, sellers, purchasers, lessees, brokers or attorneys who were a party to, or participated in, the transaction. N.J.S.A. 2A:83-1. Here, defendant's appraiser did not confirm the terms of comparable sale 3 or comparable sale 4 with any transaction participants and therefore, failed to adhere to the standards for offering valuation testimony under N.J.S.A. 2A:83-1.

Additionally, in defendant's appraiser's opinion "Union is superior to Roselle and Berkeley Heights is very superior to Roselle, [so] a -10% adjustment was made to Union and -20% to

Berkeley Heights." However, defendant's appraiser failed to explain why Union and Berkeley Heights were "superior" in location to Roselle and, more importantly, how that perceived location superiority translated into 10% and 20% differences in market value. In short, defendant's appraiser offered no statistics, data, surveys, or analysis illustrating that a comparable and competitive industrial warehouse in Berkeley Heights or Union would lease for 10% or 20% less than a similarly situated industrial warehouse in Roselle.

Accordingly, for the above-stated reasons, the court must exclude from consideration defendant's comparable sale 3 and comparable sale 4.

In analyzing 224-240 Highland Parkway, defendant's appraiser applied a -15% condition adjustment to comparable sales 1, 2, 3, and 4 to account for perceived differences in condition. In support of this condition adjustment, defendant's appraiser offered testimony that the condition of 224-240 Highland Parkway "is significantly below average as far as the overall appeal and the condition of the interior, a 15% condition adjustment was made across the board, I was not able to bracket it, I was not able to find usable sales around the sampling period of this type of condition building, so a 15% adjustment was made." Defendant's appraiser further conceded during cross-examination that he made the extraordinary assumption that the comparable sales were in better condition that 224-240 Highland Parkway. Thus, neither defendant's appraiser's report, nor his testimony to the court offered any market-derived evidence in support of his -15% condition adjustment. Moreover, defendant's appraiser furnished the court with no evidence that any of the comparable sales were in a superior condition to 224-240 Highland Parkway, or that a -15% adjustment accurately accounted for the alleged condition differences.

Additionally, in defendant's appraiser's opinion, an industrial warehouse that possesses a "higher percentage for office space is more valuable. . . therefore the subject [properties are]

23

superior to the comparable sales." Accordingly, defendant's appraiser applied a +10% adjustment to each of the comparable sales to account for every 30% less office space than the subject properties. In other words, if a comparable industrial warehouse consisted of 21% less office space than the subject properties, a +7% office space adjustment was applied.

Defendant's appraiser further posited that the percentage of building coverage an industrial warehouse occupies on the lot impacts its usefulness, and correspondingly, its value. He offered that building coverage is important for parking for office and warehouse staff, and customers, thus the more parking available, the more superior the warehouse building. Accordingly, defendant's appraiser applied a +10% adjustment to each of the comparable sales to account for every 40% more of building coverage than the subject properties. In other words, if a comparable industrial warehouse building occupied 20% more of a lot, he deemed it inferior to the subject properties, and applied a +5% building coverage adjustment.

However, defendant's appraiser offered no market-derived data, treatises, surveys, or other means of support for these adjustments or concepts. Moreover, defendant's appraisal report failed to provide any meaningful insight into how defendant's appraiser arrived at the building coverage, or office percentage adjustment formulas. Defendant's appraiser's report and testimony offered only unbridled speculation regarding the impact and influence that building coverage, office percentage, condition, and location had on the comparable sales he identified.

As stated above, adjustments must have a foundation obtained from data extracted from the marketplace, market-derived sources or objective data, and not be based on subjective observations and/or personal experiences. An appraiser's adjustments "must have a foundation obtained from the market. . ." Greenblatt, supra, 26 N.J. Tax at 55. "[T]he opinion of an expert

depends upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight in this regard." Id. at 55.

Here, defendant's appraiser failed to provide the "why and wherefore" in support of his adjustments for location, office percentage, condition, or building coverage. Defendant's appraiser did not identify any market-derived data, studies, treatises, surveys or the objective data upon which his adjustments were based. When the evidentiary foundation forming the basis of an expert's adjustment is not well-defined, the court cannot be expected to deduce a value therefrom.

Consequently, without an adequate understanding of the bases supporting defendant's appraiser's adjustments to the comparable sales data, the court is unable to conclude that they are reasonable and therefore, is unable to conclude a value for the subject property under the sales comparison approach.

3. Cost approach

Although defendant's appraisal report included a cost approach to value the subject properties, defendant's appraiser acknowledged during trial that "this [cost] "approach was not taken into effect in the final reconciliation," and the court should "disregard the cost approach."

Accordingly, the court will not address defendant's appraiser's cost approach to value.

4. Subject sale

"It is well settled that a bona fide sale of property may be indicative of the true value of the property." Glen Wall Assocs. v. Township of Wall, 99 N.J. 265, 282 (1985). As a general rule, the sale of a subject property may be indicative of the value of the property, but "is not dispositive on the issue of value." Ibid. It is for the finder of fact to weigh and appraise the sale context to determine if "special circumstances" existed that may have affected the sales price without

affecting its market value. L. Bamberger & Co. v. Division of Tax Appeals, 1 N.J. 151 (1948).

The term market value has been defined as:

> The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.
>
> [Appraisal Institute, The Appraisal of Real Estate, 58 (14th. ed. 2013).]

In discerning whether the sale of a property is a reliable indicator of market value, our courts have stated that the following five criteria must be satisfied:

> 1) buyer and seller are typically motivated and neither is under duress;
>
> 2) buyer and seller are well informed or well advised and are acting prudently, knowledgeably and in their respective self-interests;
>
> 3) the property has been reasonably exposed to an open, relevant and competitive market for a reasonable period of time;
>
> 4) the purchase price is paid in cash or its equivalent; and
>
> 5) the purchase price is unaffected by special or creative financing or by other special factors, agreements or considerations.
>
> [Venture 17, LLC v. Hasbrouck Heights, 27 N.J. Tax 108, 126 (2013) (citing Hull Junction Holding Corp, supra, 16 N.J. Tax at 94.]

Thus, when a buyer or seller were unusually influenced or highly motivated, acting imprudently, or suffering from duress, the sale of a property will not reflect market value. AT&T Corp. v. Township of Morris, 19 N.J. Tax 239, 245 (Tax 2000); American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 578-580 (1998), aff'd per curiam o.b., 19 N.J. Tax 46 (App. Div. 2000); Venture 17, LLC, supra, 27 N.J. Tax 127. "It is for the court to appraise the

circumstances surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value." Glen Wall Assocs., supra, 99 N.J. at 282.

Here the relevant valuation date is October 1, 2012. Plaintiff submitted evidence that 217-221 Highland Parkway was offered for lease and sale sometime in 2015. Moreover, plaintiff submitted copies of SR1A forms which reflect that 217-221 Highland Parkway was sold on August 31, 2015, and 224-240 Highland Parkway was sold on February 24, 2016. No evidence was offered regarding the motivation of defendant or the buyers, the terms of the sale, the subject properties exposure to the marketplace, or whether any creative or special financing was involved in the sale transactions. Additionally, the sale of 217-221 Highland Parkway took place approximately 34 months following the October 1, 2012 valuation date, and the sale of 224-240 Highland Parkway took place approximately 40 months following the October 1, 2012 valuation date. Therefore, the court concludes that the sale of the subject properties were too remote in time to be a reliable indicator of market value as of the October 1, 2012 valuation date. Moreover, the court finds that insufficient evidence was offered to support a conclusion that the sale prices of the subject properties were indicative of market value.

5. Glen Wall

Nonetheless, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Assocs., supra, 99 N.J. at 280 (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax 345, 353 (Tax 1981)). However, to enable the court to make an independent finding of true value, credible, and competent evidence must be offered in the trial record.

Here, plaintiff's and defendant's appraiser failed to produce or present the court with any analysis, studies, surveys, or to pinpoint any market-derived data supporting their adjustments to

27

the comparable leases, or the comparable sales, rendering their conclusions and opinions of value unreliable. Thus, as a result of the inadequacies in plaintiff's and defendant's appraiser's reports and testimony, the court concludes that the record contains insufficient credible evidence to make an independent determination of the true market value of the subject properties by a fair preponderance of the evidence.

### III. Conclusion

For the above stated reasons, the court concludes that plaintiff has failed to prove, by a fair preponderance of the evidence, that the market value of the subject properties, as of the October 1, 2012 valuation date, exceeded the 2013 Union County Board of Taxation Memorandum of Judgments.

Accordingly, the court will enter judgments affirming the 2013 Union County Board of Taxation Memorandum of Judgments.

Very truly yours,


/s/Hon. Joshua D. Novin, J.T.C.